**AMERICAN CONTINENTAL CORP., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 344–89C.

United States Claims Court.

March 22, 1991.

---

Mary Mitchelson, Asst. Director, with whom were Asst. Atty. Gen., Stuart M. Gerson and David M. Cohen, Director, Washington, D.C., for defendant.

## OPINION

ANDEWELT, Judge.

This is a fifth amendment takings case. The property alleged to have been taken is Lincoln Savings and Loan Association (Lincoln), a California-chartered, federally insured institution. The allegation of a taking focuses on the government's appointment of a conservator, and then a receiver, to manage Lincoln's affairs, and the receiver's transfer of Lincoln's assets to a new institution. Plaintiffs, American Continental Corporation (ACC) and First Lincoln Financial Corporation (First Lincoln), owned, either directly or indirectly, all of the common stock of Lincoln.[1] This case is presently before the court on plaintiff's motion for partial summary judgment and defendant's motion to dismiss or, in the alternative, cross-motion for summary judgment. For the reasons set forth below, no fifth amendment taking has occurred and defendant's cross-motion for summary judgment is granted.

### I.

In an April 14, 1989, resolution, the Federal Home Loan Bank Board (the Board) appointed a conservator for Lincoln on the grounds that Lincoln was "in an unsafe and unsound condition to transact business" and that there had been a "substantial dissipation of [Lincoln's] assets and earnings due to violations of law, rules and regulations and to unsafe and unsound practices." (Board Resolution No. 89–1328 at 2 (Apr. 14, 1989).) Hours after the appointment, the conservator took over management of Lincoln and a representative of the conservator took possession of Lincoln's books, records, property, and assets.

Robert K. Huffman, Washington, D.C., for plaintiffs. Leonard Bickwit, Jr. and Willard L. Boyd III, of counsel.

1. Prior to August 14, 1989, ACC was the parent and sole shareholder of First Lincoln, which in turn was the parent and sole owner of all outstanding common stock of Lincoln. On August 14, 1989, First Lincoln was merged with ACC.

Thereafter, Lincoln, ACC, and First Lincoln challenged the Board's appointment of a conservator in consolidated district court actions. Prior to a decision by the district court, the Board appointed the Federal Savings and Loan Insurance Corporation (FSLIC) as receiver for Lincoln. (Board Resolution No. 89–2163 (Aug. 2, 1989).) The FSLIC promptly transferred Lincoln's assets to a new institution, Lincoln Savings and Loan Association, F.A. (New Lincoln). The Board appointed the FSLIC as conservator of New Lincoln and the Federal Deposit Insurance Corporation (FDIC) as managing agent. On August 9, 1989, by operation of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 355 (1989), the Resolution Trust Corporation (RTC) succeeded to the interests and power of the FSLIC and the FDIC in their respective capacities as conservator and managing agent of New Lincoln.

On August 22, 1990, the district court entered an order dismissing the plaintiffs' challenge to the appointment of a conservator and then a receiver.[2] In an accompanying decision, the district court concluded that the Board had acted properly in placing Lincoln first in conservatorship and then in receivership. *Lincoln Savings & Loan Ass'n, et al. v. Wall*, 743 F.Supp. 901 (D.D.C.1990). In the course of its decision, the district court strongly criticized Lincoln's operations and ACC's conduct in dealing with Lincoln. *Inter alia*, the court analyzed a variety of banking transactions between Lincoln and ACC and characterized their actions as "dishonest" and "abusive." *Id.* The court concluded that (1) Lincoln and ACC had engaged in numerous unsafe and unsound banking practices, (2)

Lincoln was in an unsafe and unsound condition to transact business, and (3) ACC officials had abused their positions as owners of Lincoln and engaged in actions that "amounted to a looting of Lincoln." *Id.* at 906, 919.

Plaintiffs filed the instant takings action on June 20, 1989, prior to the district court decision. In their complaint, plaintiffs allege that the Board's takeover of Lincoln constitutes a taking of property for which compensation is due under the fifth amendment. Plaintiffs clarified their takings claim in the course of briefing the instant motions and again during oral argument. In effect, plaintiffs are making two distinct takings claims. The first involves the alleged taking of property from Lincoln. Plaintiffs contend that the government took Lincoln's assets, books, and records and the rights of Lincoln's management to control Lincoln's actions. Plaintiffs contend that because the receiver, appointed by the government, will not pursue such a claim, plaintiffs, as sole owners of Lincoln's common stock, are entitled to pursue the claim through a shareholder derivative action.

Plaintiffs' second claim involves an alleged taking of property directly from plaintiffs. Plaintiffs contend that as owners of Lincoln's common stock, they were entitled to control Lincoln, this "right to control" constituted property protectable under the fifth amendment, and the government took this property when it appointed a conservator and then a receiver for Lincoln. Defendant contends that neither of these claims is properly before the court. In any event, however, assuming the two claims are properly before the court,[3] neither is meritorious and, thus, de-

---

**2.** Lincoln, ACC, and First Lincoln amended their complaints in the district court action to add a challenge to the appointment of a receiver.

**3.** Defendant takes the position that this court lacks jurisdiction over plaintiffs' first claim because the Tucker Act, 28 U.S.C. § 1491, does not authorize this court to entertain a shareholder derivative suit. As to the second claim, defendant contends that a shareholder's "right to control" does not constitute property within the meaning of the fifth amendment and, therefore,

plaintiffs fail to state a claim within the jurisdiction of this court. The parties' contentions as to these defenses evolved considerably during oral argument, and the focus of the arguments shifted to theories and case law that had not been developed or cited in the course of briefing defendant's motion to dismiss. Because these theories involve issues of first impression, this court is hesitant to resolve them without additional briefing. However, since this court is firm in its conclusion that no compensable taking has occurred, the court will resolve this

fendant's motion for summary judgment must be granted.

## II.

"The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar the Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Assuming the correctness of the district court's findings concerning Lincoln's financial condition, ACC and Lincoln's business practices, and ACC's looting of Lincoln, the arrow of fairness and justice could not possibly point in plaintiffs' direction. Rather than suggesting that the general public should assume fiscal responsibility, fairness and justice would require that any damage resulting from the government's takeover of Lincoln be borne by plaintiffs.

Plaintiffs acknowledge that the doctrine of collateral estoppel precludes them from disputing the district court's findings that Lincoln had engaged in numerous unsafe and unsound business practices and that Lincoln was in an unsafe and unsound condition to transact business. Plaintiffs contend, however, that they are not bound by the district court findings that relate to any wrongdoing by ACC because these findings were not necessary and essential to the district court's decision. *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir.1983). But the mere fact that plaintiffs First Lincoln and ACC controlled Lincoln during the time Lincoln's financial condition deteriorated and Lincoln engaged in such improper practices would appear itself to be sufficient to direct the equities against plaintiffs. In any event, however, evaluation of the merits of plaintiffs' takings claims is not dependent upon this court applying the doctrine of collateral estoppel so as to preclude plaintiffs from disputing any of the district court's

findings of fact. For the reasons set forth below, the regulatory structure under which Lincoln operated was such that, even if there was no district court decision, the government's actions in assuming control of Lincoln's operations could not be found to constitute a fifth amendment taking.

## III.

The courts have not developed a "set formula" that in all cases will distinguish between public action that constitutes a compensable taking and public action that falls outside the protection of the fifth amendment's takings clause. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984), citing *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). The inquiry into whether governmental action has gone beyond mere "regulation" and constitutes a taking is essentially an "ad hoc, factual inquiry." 467 U.S. at 1005, 104 S.Ct. at 2874. Among the key factors typically considered in this inquiry are "[ (1) ] the character of the governmental action, [ (2) ] its economic impact, and [ (3) ] its interference with reasonable investment-backed expectations." *Id.* Herein, such an inquiry requires an understanding of the regulatory context in which the governmental action was taken.

There are significant benefits that stem from a savings and loan association operating as a federally insured institution, not the least of which is the association's ability to attract depositors based on the federal government's guarantee of deposits up to $100,000. 12 U.S.C. § 1728 (1989). But such benefits do not come without attendant costs. Federally insured banking is a highly regulated industry. In its effort to promote the strong public interest in a sound banking system, the federal government regulates many aspects of the business of federally insured savings and loan associations. *See, e.g., Fahey v. Mallonee,* 332 U.S. 245, 250, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947) ("Banking is one of the longest regulated and most closely super-

action on summary judgment and will refrain from putting the parties to the expense of an

additional series of briefs on defendant's motion to dismiss.

vised of public callings."); *First Nat'l Bank of Scotia v. United States*, 530 F.Supp. 162, 166 (D.D.C.1982) ("[Federal agencies] are charged with the task of overseeing [federally insured institutions] for the protection of the public and the national economy as a whole, and not for the benefit or protection of individual banking institutions.").

One small part of the extensive regulatory framework involves the potential appointment of a conservator or receiver. Pursuant to 12 U.S.C. § 1729, which was in effect at the time the Board appointed a conservator and receiver for Lincoln, the Board had the authority to appoint the FSLIC as a conservator or receiver of a state-chartered, federally insured savings and loan association, such as Lincoln, if the Board determined that "any of the grounds specified in [12 U.S.C. § 1464(d)] existed." One such specified ground was that the bank was in "an unsafe or unsound condition to transact business." Section 1464(d)(6)(A)(iii) (1989). Once appointed, the conservator or receiver of a state-chartered savings and loan association had the same broad powers and duties with respect to the insured institution as those powers and duties described in Section 1729(b)(1)(A) for a conservator or receiver of a federal bank. 12 U.S.C. § 1729(c)(1)(B)(i)(II). Those powers included the authority:

(i) to take over the assets of and operate such association;

(ii) to take such action as may be necessary to put it in a sound solvent condition;

(iii) to merge it with another insured institution;

(iv) to organize a new Federal association to take over its assets;

(v) to proceed to liquidate its assets in an orderly manner; or

(vi) to make such other disposition of the matter as it deems appropriate;

whichever it deems to be in the best interest of the association, its savers, and the Corporation....

12 U.S.C. § 1729(b)(1). The regulatory scheme permitted a challenge in district court[4] to a Board decision to appoint a conservator or receiver.[5]

## IV.

The regulatory scheme described above, which was in effect when plaintiffs made their investment in Lincoln in 1984, is the crucial focus for the ad hoc factual inquiry into whether the governmental action constitutes a fifth amendment taking.

First, given the regulatory setting, the proper characterization of the "character of the governmental action" is that the federal government was enforcing portions of an extensive regulatory scheme designed to promote the public interest in a sound banking system. As summarized above, Section 1729 authorized the Board to appoint a conservator or receiver when it found that Lincoln was in "an unsafe or unsound condition to transact business." The Board first appointed a conservator and then a receiver and the receiver in turn transferred Lincoln's assets to a new corporation—an act unambiguously within the scope of the receiver's authority as described in Section 1729(c)(1)(B)(i)(II). This characterization of the governmental action as involving such an effort to promote the public interest militates against finding a fifth amendment taking. Courts have been hesitant to find a fifth amendment taking where, as here, the government's alleged interference with property "arises from a public program that adjusts the benefits and burdens of economic life to promote the common good." *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211,

---

**4.** Section 1464(d)(1) authorized federal savings and loan associations to file suit in district court to challenge the Board's appointment of a conservator or receiver. Pursuant to Section 1729(c)(3)(A), the provisions of Section 1464(d)(1) applied to state-chartered, federally insured associations, such as Lincoln.

**5.** On August 9, 1989, 12 U.S.C. § 1729 was repealed, but the powers of a conservator and receiver and the rights of the insured institution and its shareholders remained, in pertinent part, the same. *See, e.g.,* 12 U.S.C. § 1821(d).

225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986).

This regulatory scheme is also the key to characterizing another relevant factor under *Ruckelshaus v. Monsanto*—the property owner's reasonable investment-backed expectations. In evaluating this factor, plaintiffs contend that it is necessary to distinguish between their two takings claims. The second claim, involving the alleged taking of plaintiffs' "right to control" Lincoln, can be resolved most directly. Plaintiffs did not make their investment in Lincoln until 1984. At that time, the pertinent regulatory provisions permitting the government to appoint a conservator or receiver were in effect. Therefore, to be reasonable, any expectations plaintiffs had at that time must have been made with recognition of the government's authority to make such an appointment. Because of the highly regulated nature of federally insured banking and because the government did no more than exercise its authority under statutes that pre-existed plaintiffs' investment, the government's assuming control of Lincoln could not possibly have interfered with plaintiffs' reasonable investment-backed expectations. Certainly, plaintiffs could not reasonably have expected that the government, in its dealings with Lincoln, would fail to enforce the applicable statutes and regulations.

■ Plaintiffs' first takings claim, which involves the alleged taking of property from Lincoln, arguably requires a somewhat different analysis. Since a shareholder derivative action is brought by shareholders on behalf of a corporation, *see, e.g.,* 13 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5939 at 97 (1984), plaintiffs argue that the appropriate focus here is the investment-backed expectations of Lincoln (the corporation) rather than plaintiffs (the shareholders). Lincoln first became a federally insured bank in 1934. At that time, while federally insured savings and loan associations were subject to federal regulation, there was no regulatory provision specifically authorizing the government to appoint a conservator or receiver. Congress first authorized appointment of a receiver in 1968, Bank Protection Act of 1968, Pub.L. No. 90–389, § 6, 82 Stat. 294 (1968), and the statutory authority to appoint a conservator was not enacted until 1982. *See* Garn–St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, § 122(d), 96 Stat. 1469, 1482 (1982).

■ But even assuming that the proper focus is Lincoln's investment-backed expectations rather than plaintiffs', the fact that the regulatory scheme changed somewhat after 1934 does not mean that the government's actions herein interfered with Lincoln's reasonable investment-backed expectations. To the contrary, when an investment is made in such a highly regulated industry, to be reasonable, expectations must be based not only on then-existing federal regulations but also on the recognition that there may well be related changes in the regulations in the future. *See, e.g., Atlas Corp. v. United States,* 895 F.2d 745, 758 (Fed.Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990). "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Connolly,* 475 U.S. at 227, 106 S.Ct. at 1027, quoting *FHA v. The Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958).

Here, there were numerous post–1934 changes enacted to buttress the earlier regulatory scheme designed to promote a sound banking system. Some of the changes clearly benefitted plaintiffs' investment. For example, the amount of deposits per account that was federally insured increased over time from $5,000 in 1934, National Housing Act, Pub.L. No. 479, § 405, 48 Stat. 1246, 1259 (1934), up to $100,000 in 1980, Consumer Checking Account Equity Act of 1980, Pub.L. No. 96–221, § 308, 94 Stat. 145, 147 (1980). In the face of all of the regulatory changes, Lincoln voluntarily chose to continue to operate as a federally insured bank and continued to make new investments in its opera-

tions.[6]

Moreover, there would be no unexpected interference with reasonable investment-backed expectations even if the court ignored all other regulatory changes and focused exclusively on the change permitting appointment of a conservator or receiver and if the court further ignored all subsequent Lincoln investments and focused only on investments made prior to the regulatory change permitting appointment of a conservator or receiver. As the current savings and loan crisis poignantly demonstrates, federal deposit insurance predictably leaves the government vulnerable to enormous potential liability in the case of an association's failure. In view of this potential liability, it was hardly contrary to reasonable expectations of an investor in the highly regulated, federally insured banking industry when the federal government buttressed the then-existing regulatory scheme by authorizing appointment of a conservator or receiver when a federally insured bank is in an "unsafe or unsound condition to transact business." Moreover, this change did not sanction arbitrary action by the regulatory agencies. All such appointments were subject to district court review. In addition, the conservator, and then the receiver, was obliged to operate Lincoln for the benefit of Lincoln, its depositors, and the Board, 12 U.S.C. § 1729(b)(1), and was obliged ultimately to turn all remaining proceeds over to Lincoln's shareholders after making payments to depositors, creditors, and other claimants and after paying expenses, 12 U.S.C. § 1821(d). In this context, the government's appointment of a conservator and then a receiver pursuant to the 1982 statutory scheme cannot be said to have interfered with Lincoln's reasonable investment-backed expectations.

There is a dispute as to the remaining factor discussed in *Ruckelshaus v. Monsanto*—the economic effect of the governmental action. In their complaint, plaintiffs contend that "the Board's takeover of Lincoln and the resulting actions and inactions of the Board and the conservator have reduced the fair market value of Lincoln's assets." In response, defendant contends that, if anything, the Board's actions improved Lincoln's economic position, *inter alia*, because the conservator stopped the looting of Lincoln by ACC. But, in any event, this dispute as to the economic effect need not be resolved to decide the takings issue. In view of this court's conclusions above as to the character of the governmental action and the absence of any interference with investment-backed expectations, fairness and justice require a decision that no taking has occurred, regardless of the alleged economic effect.

As explained above, plaintiffs and Lincoln voluntarily invested in a highly regulated industry and voluntarily chose to continue to operate in that industry in the face of numerous regulatory changes. The governmental action in dispute involves the government's enforcing an established regulatory scheme designed to promote the public interest in a sound banking system. That scheme did not, in any significant way, interfere with any reasonable investment-backed expectations. In pertinent part, it (1) permitted appointment of a conservator or receiver only upon a finding that Lincoln was in an "unsafe and unsound condition," (2) authorized district court review of any such appointment, and (3) obliged the conservator or receiver to pay all remaining proceeds to Lincoln's shareholders.

In this context, plaintiffs and Lincoln, as investors, were on reasonable notice as to what the "rules of the game" were, or reasonably could be, in the highly regulated banking industry. Plaintiffs' fifth amendment takings action, in effect, represents an effort to change those rules after the fact. But it would be no more fair and just to change the rules and require the public to pay damages here when plaintiffs allegedly lost money than it would be to change the rules and require plaintiffs to

---

**6.** Plaintiffs contend that Lincoln's actions should not be viewed as voluntary because California state law conditioned Lincoln's right to operate as a savings and loan association in California on Lincoln being federally insured. But the federal government can hardly be held financially liable for the regulatory decisions of the State of California.

make unexpected extra payments to the public had plaintiffs' investment turned out to be highly successful.

■ One other point is worth noting on the issue of economic harm. The alleged economic harm upon which plaintiffs rely did not result directly from the governmental act that plaintiffs classify as a taking. As explained in detail below, the taking plaintiffs allege is the government's permanent physical occupation of Lincoln. That purported taking occurred on or about April 14, 1989, when the conservator asserted physical control over Lincoln and its assets. But that assertion of control over Lincoln's assets involved, in essence, merely a change in management. As noted above, the conservator, and then the receiver, was obliged to operate Lincoln for the benefit, *inter alia*, of Lincoln, and ultimately was obliged to turn over any remaining monies to Lincoln's shareholders. Thus, to the extent the government's takeover of Lincoln had any significant economic effect, that effect was not the direct result of the physical occupation of Lincoln (*i.e.*, the alleged taking) but rather the result of the "actions and inactions" that the conservator and receiver took after the takeover had occurred. Rather than raising issues under the fifth amendment, claims of mismanagement would appear to sound in tort and, therefore, would fall outside this court's Tucker Act jurisdiction. *See* 28 U.S.C. § 1491(a).

## V.

Plaintiff's argument that the government's exercise of its regulatory authority constituted a taking is based primarily on the Supreme Court's analysis of the scope of the fifth amendment's takings clause in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). *Loretto* involved a New York state statute that obliged the owners of residential, multifamily buildings to permit cable television (CATV) companies to attach CATV equipment on the buildings so as to permit tenants to receive CATV service. In concluding that the state statute constituted a fifth amendment taking, the Supreme Court rejected the multifactor analysis, summarized above, that is typically employed in takings cases. The Court instead adopted a *per se* approach. The Court stated:

[W]e have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause. Our cases further establish that when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred. In such a case, "the character of the government action" not only is an important factor in resolving whether the action works a taking but also is determinative.

*Loretto*, 458 U.S. at 426, 102 S.Ct. at 3171. Herein, because representatives of the conservator took physical possession of Lincoln's books, records, property, and assets,[7] plaintiffs contend that the proper characterization of the governmental action is "a permanent physical occupation" of plain-

---

7. On August 14, 1989, in addition to appointing the FSLIC as conservator for Lincoln, the Board adopted a resolution that "one or more persons shall be designated as Special Representative of the Conservator" and shall have the authority "to take prompt possession of the books, records, property, and assets of every kind and description of Lincoln." (Board Resolution No. 89–1328 at 7 (Apr. 14, 1989).) Approximately one hour after the appointment, agents of the conservator entered Lincoln's head offices in California and served on Lincoln a letter informing it of the conservatorship. The letter stated that the conservator was "now taking possession of [Lincoln]" and would assume "all powers of [Lincoln's] members, officers, and directors.... No member(s), officer(s), or di-

rector(s) shall thereafter have or exercise any such ... power ... or act in connection with any of [Lincoln's] assets or property." The letter further threatened "criminal penalties for refusal to comply with the Conservator's demand for possession of the property, business, and assets of [Lincoln]."

On April 14, 1989, agents of the conservator also entered and took possession of Lincoln's offices in Los Angeles and several of its California branch offices. Shortly thereafter, agents of the conservator entered and took possession of Lincoln's offices in Phoenix, Arizona. These and other agents took control of Lincoln's operations, seized its files, and placed uniformed guards around the offices.

tiffs' property and, hence, that the *per se* approach of *Loretto* must be employed.

This argument misunderstands the rationale of *Loretto*. In *Loretto*, the Court adopted a *per se* approach because the government's actions interfered with the expectations that the property owners had (and in a typical situation would have) based on their ownership of a "physical thing." The Court explained that "property rights in a physical thing" involve the rights "to possess, use and dispose of [the thing]" and that government action that results in permanent occupation of physical property effectively destroys each of these rights. *Id.* at 435, 102 S.Ct. at 3175, quoting *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). The Court reasoned that "property law has long protected an owner's expectation that he will be relatively undisturbed at least in the possession of his property," 458 U.S. at 436, 102 S.Ct. at 3176, and explained the intended narrow scope of its decision as follows: "Our holding today is very narrow. We affirm the traditional rule that a permanent physical occupation of property is a taking. In such a case the property owner entertains a historically rooted expectation of compensation...." *Id.* at 441, 102 S.Ct. at 3179.

*Loretto* cannot properly be interpreted to cover situations such as the instant case where its rationale would not apply because the property owners could not reasonably have had such traditional expectations as to their ability "to possess, use, and dispose of" their property or as to their right to compensation. Herein, for the reasons set forth above, plaintiffs' and Lincoln's expectations as to the operation of Lincoln reasonably must have been rooted in the scope of the government's regulatory authority rather than in historical notions of the rights of owners of physical things. Clearly, plaintiffs and Lincoln

could not reasonably have expected "that [they would] be relatively undisturbed at least in the possession of [their] property." *Id.* at 436, 102 S.Ct. at 3176. To the contrary, plaintiffs' expectations could only be that regulators would exert physical control over Lincoln's assets if the Board made a finding that Lincoln was in "an unsafe or unsound condition to transact business."

Similarly, plaintiffs and Lincoln could not reasonably have had an "expectation of compensation," *id.* at 441, 102 S.Ct. at 3179, when the government made such a finding and appointed a conservator, and then a receiver, to take over Lincoln's assets. To the contrary, plaintiffs' expectations as to compensation in the event of an appointment of a conservator or receiver were defined in the pertinent statutes and regulations. In pertinent part, Lincoln could contest the appointments of the conservator and receiver in district court, *see supra* note 4, and was entitled to receive monies left over after required dispositions.[8]

### VI.

As is apt to occur when a *per se* rule exists, plaintiffs' efforts herein have been directed primarily at squeezing the government's action into the language that the Supreme Court used in defining the *per se* rule in *Loretto*. Plaintiffs argue strenuously that the government's conduct on April 14, 1989, must be characterized as a permanent physical occupation of plaintiffs' property. Plaintiffs then argue, in effect, that because this action falls within the grasp of the magic words of the *per se* rule, the entire regulatory context in which the action was taken is irrelevant and must be ignored.

Based on the dictionary definitions of the terms, the government's actions herein can at least be argued to have resulted, inci-

---

8. *United States v. Pewee Coal Co.*, 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951), does not warrant a different result. Therein, the federal government sought to avert a nationwide strike of miners by taking over operation of "all mines producing coal in which a strike or stoppage has occurred or is threatened." *Id.* at 116, 71 S.Ct. at 671. But in *Pewee* there was no established

regulatory scheme analogous to the regulatory scheme in the instant action. Hence, in *Pewee*, like *Loretto* but unlike the instant case, the property owner had an expectation that it would be relatively undisturbed in its possession of the property and that it would receive compensation in the event the government took control of the property.

dently, in some degree of "physical occupation" of "a physical thing" and, in addition, that occupation can be argued in some sense to be "permanent." On April 14, 1989, in an effort to perform its statutory responsibilities with respect to a savings and loan association that it found to be in an unsafe and unsound condition, the government placed its own representatives physically in Lincoln's buildings, assumed physical control of Lincoln's assets, and apparently barred the old management from returning.[9] But Loretto should not be interpreted as building a wall around the dictionary definitions of the words "permanent physical occupation" through which the light of analysis and reason may not pass. The fifth amendment to the Constitution embodies very basic concepts concerning this nation's respect for private property and the relationship between a citizen and its government with respect to that property. In view of the very fundamental nature of the issues involved, Loretto cannot, and should not, be extended by mere analogy without careful analysis.

In Loretto, the Court departed from the standard ad hoc multifactor analysis typically employed in takings cases. But it did not do so because the standard multifactor analysis would have produced a different result. Rather, it so departed because the governmental action at issue so unambiguously offended the property interest protected under the fifth amendment that the ultimate outcome of the takings analysis was apparent. As explained above, the governmental action offended historically rooted expectations that the owner of an apartment building had with respect to that property. It was in that context that the Court defined the character of the governmental action as the "permanent physical occupation" of property and ended its takings analysis.

But a similar definition of the ultimate character of the governmental action and a similar short cut of the takings analysis cannot be justified here. The Loretto per se approach should not facilely be extended in cases where the historically rooted expectations that underlie the Loretto decision do not remotely apply. The instant case involves a regulatory action in a highly regulated industry in which the government took actions that reasonably should have been expected by plaintiffs and Lincoln. It seems beyond any serious doubt that fairness and justice demand that these factors at least be considered when evaluating plaintiffs' fifth amendment takings claim. It similarly seems beyond doubt that these factors, once considered, are determinative and that no fifth amendment takings has occurred.

*Conclusion*

For the reasons set forth above, there are no material issues of fact in dispute and defendant is entitled to judgment as a matter of law. Accordingly, plaintiffs' motion for partial summary judgment is denied and defendant's cross-motion for summary judgment is granted. The Clerk of the Court is directed to dismiss plaintiffs' complaint. No costs.

IT IS SO ORDERED.

9. Plaintiffs' allegation that the per se approach of Loretto applies because plaintiffs' property was subject to "permanent physical occupation" seems particularly remote for plaintiffs' second takings claim. For that claim, the property allegedly taken was the shareholders' "right to control" Lincoln. A "right to control" a corporation is not a "physical thing" and certainly cannot be "physically occupied."