**GOLDEN PACIFIC BANCORP and Miles P. Jennings, Jr., Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 92–5141.

United States Court of Appeals, Federal Circuit.

Feb. 8, 1994.

Rehearing Denied; Suggestion for Rehearing In Banc Declined March 18 and April 19, 1994.

Jonathan Macey, of Ithaca, New York, argued for plaintiffs-appellants. With him on the brief was Leonard A. Leo.

Joan M. Bernott, Department of Justice, of Washington, D.C., argued for defendant-appellee. Stuart M. Gerson, Assistant Attorney General, David M. Cohen, Director and Allen D. Bruns, Assistant Director, Commercial Litigation Branch, Department of Justice, of Washington, D.C., were on the brief for defendant-appellee. Also on the brief was David C. Douglas, Senior Trial Attorney, Litigation Division, Office of the Chief Counsel, Comptroller of the Currency, of counsel.

Before LOURIE, CLEVENGER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

Appellants, Golden Pacific Bancorp (Golden Pacific) and Miles P. Jennings, Jr., appeal from an order of the United States Claims Court, No. 91–1242C (April 28, 1992), dismissing their complaint seeking compensation for a taking under the Fifth Amendment of the United States Constitution. *Golden Pac. Bancorp v. United States,* 25 Cl.Ct. 768 (1992).[1]

Golden Pacific is a bank holding company and owns approximately 90 percent of the stock of Golden Pacific National Bank (Bank). Jennings owns 6,400 shares of the stock of Golden Pacific. Golden Pacific and Jennings filed an action in the Claims Court alleging that the actions of the Comptroller of the Currency (Comptroller) in declaring the Bank insolvent and appointing the Federal Deposit Insurance Corporation (FDIC) as receiver constituted a taking for which they were entitled to compensation under the Fifth Amendment. The Claims Court granted the government's motion for summary judgment after concluding that the actions of the Comptroller did not constitute a compensable taking. *Id.* at 771.[2] For the reasons set forth below, we affirm the judgment of the Claims Court.

## BACKGROUND

The pertinent facts are not in dispute. The Bank was a national bank, with its principal place of business in New York City. *Id.* at 769. The Bank was chartered pursu-

---

1. The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516, changed the name of the United States Claims Court to the "United States Court of Federal Claims." Except where the context requires otherwise, we refer to the trial court by the name which it had while this matter was pending before it.

2. The government moved to dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b) of the United States Claims Court (RUSCC), or in the alternative, for summary judgment. We agree with the parties that, in dismissing the complaint, the Claims Court granted the motion for summary judgment.

ant to 12 U.S.C. § 27 (1988)[3] and subject to the regulatory authority of the Comptroller pursuant to 12 U.S.C. § 1 (1988). *Id.*

Acting on an informant's tip, the Comptroller undertook a surprise investigation of the Bank on June 17, 1985. *Id.* The Comptroller's actions were taken as a result of the Bank's practice of issuing "yellow" certificates of deposit (Yellow CDs). *Id.* The Bank purportedly regarded Yellow CDs as non-book "investments" made by it on behalf of the CD holders. *Id.* Based upon his investigation, however, the Comptroller determined that the Yellow CDs were, in fact, deposits. *Id.* As deposits, the Yellow CDs were liabilities of the Bank, and the Bank was required to maintain offsetting assets, or it would be technically insolvent. *Id.*[4] Since the Comptroller was not satisfied that the Bank possessed such assets, he began preparing a cease and desist order to halt the practice of issuing Yellow CDs. *Id.* Before the cease and desist order could be issued, however, rumors of the Comptroller's investigation precipitated a run on the Bank. *Id.* Faced with what he regarded as inadequate assets and a run on the Bank, the Comptroller declared the Bank insolvent pursuant to 12 U.S.C. § 191[5] and placed it in FDIC receivership pursuant to 12 U.S.C. § 1821(c)[6]. *Id.*

After the Bank was closed, Golden Pacific brought an action in the United States District Court for the District of Columbia. In its district court complaint, Golden Pacific

sought (i) review of the Comptroller's actions under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) (1988), alleging that the Comptroller's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" (ii) damages from the government under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2680(a) (1988), for the Comptroller's actions; and (iii) damages and injunctive relief under the Fifth Amendment. On December 1, 1986, the district court granted summary judgment for the government. *Golden Pac. Bancorp v. Clarke*, No. 85–2384, slip op. at 1 (D.D.C. Dec. 1, 1986). In so doing, the district court addressed Golden Pacific's APA and FTCA claims. After considering the administrative record, the district court concluded that, in declaring the Bank insolvent and placing it in receivership, the Comptroller had acted within the scope of his statutory authority and that his actions were not arbitrary, capricious, or undertaken in bad faith. *Id.* at 6.[7]

The district court did not address Golden Pacific's claim under the Fifth Amendment for monetary and injunctive relief. Golden Pacific had acknowledged at an earlier stage of the proceedings that any monetary claim it was asserting against the government sounded in tort. Thus, when the district court granted the government's motion for summary judgment, Golden Pacific was no longer asserting any monetary claims under the Fifth Amendment.[8] As far as Golden Pacif-

3. The 1988 version of the United States Code contains the statutory provisions which were in effect at the time of the events in question.

4. In general, ordinary bank CDs are written acknowledgements issued by a bank for interest-bearing time deposits maturing on a specific date. With the exception of their color, Yellow CDs had the same physical appearance as ordinary bank CDs because they bore the Bank's name and stated a fixed rate of interest and maturity date. The Yellow CDs were also honored by the Bank upon demand or maturity, like ordinary bank CDs. *Golden Pac. Bancorp*, 25 Cl.Ct. at 769.

5. "[W]henever the Comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, ... appoint a receiver, who shall proceed to close up such association." *See* 12 U.S.C.

§ 191 (1988) (current version at 12 U.S.C. § 191 (Supp. IV 1992)).

6. "[W]henever the Comptroller of the Currency shall appoint a receiver other than a conservator ..., he shall appoint the [Federal Deposit Insurance] Corporation receiver for such closed bank." *See* 12 U.S.C. § 1821(c) (1988) (current version at 12 U.S.C. § 1821(c)(2)(A)(ii) (Supp. IV 1992)).

7. The Comptroller's conclusion that Yellow CDs were bank liabilities was separately confirmed by a federal district court in an action brought by the FDIC. *See FDIC v. Holders of Yellow Certificates Nos. 1–367*, No. 85–8164 (S.D.N.Y. Sept. 16, 1986).

8. After Golden Pacific's complaint was filed in the district court, the government moved to dis-

ic's claim for injunctive relief under the Fifth Amendment was concerned, it appears that the district court either overlooked the claim or viewed its decision with respect to the APA and FTCA claims as being dispositive of any request for injunctive relief.

On appeal, the United States Court of Appeals for the District of Columbia Circuit affirmed the district court judgment. *Golden Pac. Bancorp v. Clarke,* 837 F.2d 509, 513 (D.C.Cir.), *cert. denied,* 488 U.S. 890, 109 S.Ct. 223, 102 L.Ed.2d 213 (1988). The court of appeals determined that Golden Pacific's action was "nothing more than a claim for damages under the FTCA." *Id.* at 510.[9] The court concluded, however, that a FTCA cause of action was not available to Golden Pacific because the Comptroller's actions fell within the discretionary function exception to the FTCA. *Id.* at 511–512.[10] The court declined to reach Golden Pacific's claim under the Fifth Amendment because it was argued on appeal only in a reply brief. *Id.* at 513.

On June 21, 1991, appellants filed an action in the Claims Court, alleging that the Comptroller's actions constituted a compensable taking under the Fifth Amendment, a breach of an implied contract between the Comptroller and the Bank and its shareholders, and a mistake of fact.[11] In response, the government moved to dismiss for lack of subject matter jurisdiction, or in the alternative, for summary judgment, asserting that res judi-

cata barred the taking claim under the Fifth Amendment and that the Comptroller's actions did not constitute a compensable taking under the Fifth Amendment.

The Claims Court held that the actions of the Comptroller in declaring the Bank insolvent and placing the Bank in FDIC receivership did not constitute a compensable taking under the Fifth Amendment. *Golden Pac. Bancorp,* 25 Cl.Ct. at 771. The Claims Court determined that appellants "lacked 'one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others.'" *Id.* at 770 (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 174, 179–80, 100 S.Ct. 383, 390, 392–93, 62 L.Ed.2d 332 (1979)). Without the right to exclude others, the court stated, appellants did "not have the 'historically rooted expectation of compensation' necessary to establish a fifth amendment taking." *Id.* at 770–771 (quoting *California Hous. Sec., Inc. v. United States,* 959 F.2d 955, 958 (Fed.Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992)). The court also stated that appellants' "reasonable investment-backed expectations could not possibly have been interfered with given the highly regulated nature of the banking industry." *Id.* at 771. Since it found the Fifth Amendment issue to be dispositive, the Claims Court did not address the government's contention regarding res judicata. *Id.* at 771 n. 3. This appeal followed.

---

miss for lack of subject matter jurisdiction that part of Golden Pacific's claim that sought monetary relief and did not sound in tort. The government argued that under the Tucker Act, 28 U.S.C. § 1491 (1988), the district court only had jurisdiction over non-tort monetary claims not exceeding $10,000 and that Golden Pacific had not stated that its non-tort claim was limited to below $10,000. Responding to the government's motion, the district court stated: "The court agrees with plaintiff that this is a tort action and tort relief is requested. The Tucker Act only applies to cases 'not sounding in tort' and therefore has no application here." *Golden Pac. Bancorp v. Selby,* No. 85–2384, slip op. at 4 (D.D.C. Feb. 7, 1986).

9. The court saw the APA as merely serving "as a device upon which to predicate damages for alleged arbitrary and capricious actions of the Comptroller." *Golden Pac. Bancorp,* 837 F.2d at 511.

10. The FTCA authorizes damage suits against the United States for negligent or wrongful acts or omissions of its employees. 28 U.S.C. § 1346(b) (1988). However, the FTCA limits such actions by exempting

... [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (1988).

11. Subsequently, appellants abandoned their implied-contract and mistake-of-fact claims during oral argument before the Claims Court.

## DISCUSSION

### A. *Standard of Review*

"Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987) (citations omitted). In reviewing a grant of summary judgment by a trial court, we determine whether the standards for summary judgment have been met and are not bound by the trial court's ruling that there was no material factual dispute present in the case. *Id.* at 1390. In this case, there is no genuine issue of material fact, and the Claims Court did not err in concluding that the government was entitled to judgment as a matter of law.

### B. *Analysis*

■ As a preliminary matter, the government argues that Golden Pacific's taking claim is barred by the doctrine of res judicata, in the sense of claim preclusion, based upon the district court judgment and the affirmance of that judgment on appeal. Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based upon the same claim or cause of action. 1B James W. Moore et al., Moore's Federal Practice ¶ 0.401[1] (2d ed. 1993).

The doctrine of res judicata does not apply because Golden Pacific's taking claim before the Claims Court was not the same as Golden Pacific's APA and FTCA claims before the district court. The taking claim was never litigated in the district court action. As noted above, the district court regarded Golden Pacific's action as, for all intents and purposes, a tort action requesting tort relief, *see supra* note 8, as did the D.C. Circuit.[12] The district court also did not discuss Golden

Pacific's claim for injunctive relief under the Fifth Amendment in its decision granting summary judgment for the government. Moreover, the taking claim could not have been litigated, in the district court action, in view of the fact that the district court lacked subject matter jurisdiction over Golden Pacific's taking claim because it was a non-tort monetary claim exceeding $10,000. *Golden Pac. Bancorp v. Selby,* No. 85–2384, slip op. at 4 (D.D.C. Feb. 7, 1986). Accordingly, Golden Pacific's taking claim is not barred by the doctrine of res judicata because the suit before the Claims Court was not based upon the same claim as the suit before the district court.

■ Turning to the merits, the Fifth Amendment states that "private property [shall not] be taken for public use without just compensation." A regulatory imposition may result in a compensable taking in either of two ways. First, as a result of a regulatory scheme, a property owner may suffer a physical invasion or permanent occupation of his or her property. In *Lucas v. South Carolina Coastal Council,* — U.S. —, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Supreme Court stated that a regulation that compels a property owner to "suffer a physical 'invasion' of his property" is a category of regulatory action which is "compensable without case-specific inquiry into the public interest advanced in support of the restraint." *Id.* at —, 112 S.Ct. at 2893. In general, in the case of physical invasions, the Court pointed out, "no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation." *Id.*[13] Thus, in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), the Court held that placement of certain equipment on a building pursuant to a

---

12. That a tort claim is what was really involved in the district court action is borne out by the following statement from the decision of the D.C. Circuit:

> [A]t oral argument counsel for appellant conceded that the only relief appellant seeks is monetary damages; no specific relief under the APA is any longer—if it ever was—at issue. Golden Pacific's claim under the APA, it seems to us, serves only as a device upon which to

predicate damages for alleged arbitrary and capricious actions of the Comptroller.

*Golden Pac. Bancorp,* 837 F.2d at 511.

13. The Court in *Lucas* stated that an additional "situation in which ... categorical treatment [is] appropriate is where regulation denies all economically beneficial or productive use of land." *Id.*

New York statute requiring a landlord to permit installation of cable television facilities on her property at a government-fixed rate was a taking because it constituted a physical occupation of her property. In *Loretto,* the Court concluded that "a permanent physical occupation authorized by [the] government is a taking without regard to the public interests that it may serve." *Id.* at 426, 102 S.Ct. at 3171. In addition, the Court stated that "[i]n such a case, the property owner entertains a historically rooted expectation of compensation, and the character of the invasion is qualitatively more intrusive than perhaps any other category of property regulation." *Id.* at 441, 102 S.Ct. at 3179. The kind of physical invasion and permanent occupation that was involved in *Loretto* has been referred to as a taking per se. *See id.* at 442, 102 S.Ct. at 3179.

██ A regulatory scheme may also result in a compensable taking without a physical invasion or occupation of property. Such a taking occurs "when regulations go 'too far' and impinge on private freedom." John A. Humbach, *"Taking" the Imperial Judiciary Seriously: Segmenting Property Interests and Judicial Revision of Legislative Judgments,* 42 Cath.U.L.Rev. 771, 777 (1993) (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922)). In *Mahon,* the claimant had sold the surface rights to particular parcels of property but had reserved the right to remove the coal underlying the parcels. A Pennsylvania statute which was enacted after these transactions prohibited any mining of coal that caused the subsidence of any house, unless the house was the property of the owner of the underlying coal and was more than 150 feet from the improved property of another. Because the statute made it commercially impracticable to mine the coal and thus had nearly the same effect as the complete destruction of rights claimant had reserved from the owners of the surface land, the Supreme Court held that the statute effected a taking without just compensation. 260 U.S. at 414–15, 43 S.Ct. at 159–60. In the words of Justice Holmes, the Pennsylvania statute went "too far." *Id.* at 415, 43 S.Ct. at 160.

In cases where a regulatory scheme does not involve a physical invasion or occupation of property, the Supreme Court "has generally 'been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action' " must be deemed a compensable taking. *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979) (quoting *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)); *accord Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 295, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981). The type of case-by-case approach that is required is set forth in *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984):

> The inquiry into whether a taking has occurred is essentially an "ad hoc, factual" inquiry. *Kaiser Aetna,* 444 U.S. at 175 [100 S.Ct. at 390]. The Court, however, has identified several factors that should be taken into account when determining whether a governmental action has gone beyond "regulation" and effects a "taking." Among those factors are: "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Prune-Yard Shopping Center v. Robins,* 447 U.S. [74] at 83 [100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980) ]; *see Kaiser Aetna,* 444 U.S. at 175 [100 S.Ct. at 390]; *Penn Central,* 438 U.S. at 124 [98 S.Ct. at 2659].

467 U.S. at 1005, 104 S.Ct. at 2874.

Golden Pacific's principal argument on appeal is that the highly regulated nature of the banking industry does not preclude its taking claim. Put another way, Golden Pacific contends that the Claims Court erred when it held, 25 Cl.Ct. at 770–71, that Golden Pacific did not have the historically rooted expectation of compensation necessary to establish a Fifth Amendment taking and that the Comptroller's actions did not interfere with any reasonable investment-backed expectations on the part of Golden Pacific. Golden Pacific also argues that, in declaring the Bank insolvent and placing it in FDIC receivership, the Comptroller "reneged" on a

prior commitment to value Yellow CDs in determining bank solvency, and that the closure of the "solvent" Bank without shareholder compensation failed to advance a legitimate government purpose and deprived Golden Pacific of its property within the meaning of the Fifth Amendment. We turn first to Golden Pacific's principal argument.

In arguing that the actions of the Comptroller vis-a-vis the Bank constituted a taking for which compensation is due, Golden Pacific appears to rely both upon a per se analysis and also upon an analysis grounded in the factors set forth above in *Monsanto*. This is not surprising. On the one hand, when the Comptroller placed the Bank in FDIC receivership for liquidation there was, in a very real sense, a physical invasion and permanent occupation, certainly as far as the premises of the Bank were concerned. On the other hand, the Comptroller did not actually take Golden Pacific's property, its shares of stock in the Bank. Rather, it may be argued that, through his actions, the Comptroller reduced, if not eliminated, the value of those shares. Thus, Golden Pacific states that "[t]he property rights that the shareholders are seeking to vindicate have absolutely nothing to do with their right to physical possession and management of the bank's premises." According to Golden Pacific, "[t]he shareholders maintain that the government's action deprived them of the value of their stock. They are not seeking to redress wrongs to the corporation." However, we need not decide the question whether the claim of a party in Golden Pacific's situation is for a taking per se or for a taking that is found after an analysis of the factors stated in *Monsanto*. The reason is that, whichever way one looks at this case, Golden Pacific is unable to establish a compensable taking.[14]

The resolution of this case is controlled by our decision in *California Housing Securities*. There, California Housing Securities, Inc. (CHS) sought compensation for an alleged taking under the Fifth Amendment, based upon the appointment and subsequent actions of the Resolution Trust Corporation (RTC) as conservator and receiver of Saratoga Savings and Loan Association (Saratoga). *California Hous. Sec.,* 959 F.2d at 957. In so doing, CHS relied on *Loretto* in contending that the actions of the government resulted in a permanent occupation and physical taking of Saratoga's property in violation of the Fifth Amendment's taking clause. We held that the "RTC's occupation and seizure of Saratoga, and its subsequent liquidation of Saratoga's assets, cannot constitute a physical fifth amendment taking because neither Saratoga nor CHS could have developed a historically rooted expectation of compensation for such a seizure." *Id.* at 958. "Saratoga lacked the fundamental right to exclude the government from its property at those times when the government could legally impose a conservatorship or receivership on Saratoga." *Id.* Thus, "[a]s a consequence of the regulated environment in which Saratoga voluntarily operated, Saratoga and CHS held less than the full bundle of property rights." *Id.* In reaching our conclusion in *California Housing Securities*, we reviewed the pertinent regulatory scheme, *id.* at 955–956, and pointed out that when Saratoga obtained federal deposit insurance, it voluntarily subjected itself to the highly regulated banking industry. "It is well known that '[b]anking is one of the longest regulated and most closely supervised of public callings.'" *Id.* at 958 (quoting *Fahey v. Mallonee,* 332 U.S. 245, 250, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947)).

The regulatory scheme applicable to federally-insured savings and loan associations, such as Saratoga in *California Housing Securities,* is similar to the regulatory scheme applicable to national banks, such as the Bank here. *Compare* 12 U.S.C. § 1464(d)(6)(A) (1988) (grounds for appointment of receiver for savings and loan association) (current version at 12 U.S.C. § 1464(d)(2)(A) (Supp. IV 1992)) *with* 12 U.S.C. § 191 (1988) (grounds for appointment of receiver for national banking association) (current version at 12 U.S.C. § 191 (Supp. IV 1992)). Golden Pacific voluntarily entered into the highly regulated banking industry by choosing to invest in the Bank.

---

14. Appellant Jennings has no claim independent of those of Golden Pacific. Therefore, our decision regarding Golden Pacific's claim disposes of Jennings' appeal.

The actions of the Comptroller simply enforced "portions of an extensive regulatory scheme designed to promote the public interest in a sound banking system." *American Continental Corp. v. United States,* 22 Cl.Ct. 692, 696 (1991). At those times when the Comptroller could legally inspect the Bank or place it in receivership, the Bank—which Golden Pacific owned—was unable to exclude the government from its property. *See California Hous. Sec.,* 959 F.2d at 958. Just as Saratoga did not have the right to exclude the RTC in *California Housing Securities,* the Bank did not have the right to exclude the Comptroller. Consequently, neither the Bank nor Golden Pacific "could have developed a historically rooted expectation of compensation" for the seizure which resulted from the Comptroller's actions. 959 F.2d at 958. For this reason, Golden Pacific's *Loretto* claim fails.

▮ Golden Pacific fares no better if its claim is viewed as one based upon a regulatory taking not involving the physical invasion or occupation of property. We need only focus upon the third of the three factors set forth above in *Monsanto:* interference with reasonable investment-backed expectations. *Monsanto* teaches that "the force of this factor [may be] so overwhelming ... that it disposes of the taking question...." 467 U.S. at 1005, 104 S.Ct. at 2874. Indeed, that is precisely the case here. Given the highly regulated nature of the banking industry, just as under a *Loretto* analysis Golden Pacific could not have had a historically rooted expectation of compensation for the Comptroller's actions, so too, the Comptroller's actions could not possibly have interfered with a reasonable investment-backed expectation on the part of Golden Pacific. Put most simply, Golden Pacific could not have reasonably expected that the government "would fail to enforce the applicable statutes and regulations." *See American Continental,* 22 Cl.Ct. at 697. Indeed, Golden Pacific's expectations could only have been that the FDIC would exert control over the Bank's assets if the Comptroller became satisfied that the Bank was insolvent and chose to place it in receivership. *See* 12 U.S.C. § 191 (1988) ("whenever the Comptroller shall become satisfied of the insolvency of a national banking association, he may ... appoint a receiver, who shall proceed to close up such association") (current version at 12 U.S.C. § 191 (Supp. IV 1992)).

Golden Pacific's reliance on *Monsanto,* 467 U.S. 986, 104 S.Ct. 2862, and *United Nuclear Corp. v. United States,* 912 F.2d 1432 (Fed. Cir.1990) is misplaced. In *Monsanto,* the Supreme Court found a regulatory taking of proprietary trade secrets by reason of a federal statute forcing disclosure of the trade secrets. 467 U.S. at 1016, 104 S.Ct. at 2879. In *United Nuclear,* this court found a regulatory taking in an agency action dispossessing a plaintiff's leasehold interest in Indian lands. 912 F.2d at 1433. However, the trade secret interest in *Monsanto* and the leasehold interest in *United Nuclear* are fundamentally different from the interest represented by Golden Pacific's investment in the Bank. Monsanto and United Nuclear each possessed reasonable investment-backed expectations, the reason being that, inherent in each of their respective interests—Monsanto's ownership of trade secrets and United Nuclear's status as a lessee—was, in one sense or another, the right to exclude others. *See Monsanto,* 467 U.S. at 1011, 104 S.Ct. at 2877 ("[w]ith respect to a trade secret, the right to exclude others is central to the very definition of the property interest"); *United Nuclear,* 912 F.2d at 1436 ("The fact that United agreed that the leases would be subject to future regulation does not indicate that United fairly can be said to have anticipated that the Secretary would apply a new policy requiring tribal approval of mining plans to leases entered into almost six years earlier, in reliance on which United had expended some $5 million.") As we stated in *Hendler v. United States,* 952 F.2d 1364, 1374 (Fed. Cir.1991), "[i]n the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession—the right to *exclude* strangers, or for that matter friends, but especially the Government." By contrast, as already seen, Golden Pacific did not possess either the historically rooted expectation of compensation or the reasonable investment-backed expectation necessary to support a Fifth Amendment taking because it chose to invest in an entity—the Bank—

which did not possess the right to exclude others. And the reason the Bank did not possess the right to exclude others—most notably the Comptroller—was that the Bank was a member of a highly regulated industry.

■ Golden Pacific's second argument—that the government "reneged on a commitment to value Yellow CDs"—is based upon the contention that the Bank engaged in the same "investment" practice in 1981 as it did in 1985 and was not criticized for it then. It appears that Golden Pacific is making this argument in order to have us conclude that conduct on the part of .the Comptroller in 1981 created a regulatory environment of non-interference as far as the Bank's Yellow CD program was concerned. Presumably, Golden Pacific would have us hold, based upon that conclusion, that it did in fact have the kind of reasonable investment-backed expectation necessary to support a taking claim. Specifically, so the argument goes, by reason of the actions of the Comptroller, an expectation arose that the value of Golden Pacific's investment in the Bank would not be diminished by any actions of the Comptroller stemming from a finding that the Yellow CD program was improper or stemming from a refusal by the Comptroller "to credit the asset side of [the Bank's] balance sheet when treating the Yellow CDs as liabilities." Stated another way, Golden Pacific is arguing that the Comptroller's alleged conduct vis-a-vis the Yellow CD program had the effect of creating a regulatory environment different from the one which compelled our holding in *California Housing Securities.*

■ There are two problems with this line of argument. First, the district court found, as a factual matter, that there was no conduct on the part of the Comptroller in 1981 that amounted to a commitment with respect to the treatment of the Yellow CDs. Golden Pacific is collaterally estopped from contesting that finding. "Under collateral estoppel, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties." *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 467 n. 6, 102 S.Ct. 1883, 1890 n. 6, 72 L.Ed.2d 262 (1982) (citing *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) and *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979)).[15] Thus, the factual underpinning for Golden Pacific's argument is lacking. Second, and more fundamentally, even if the necessary factual predicate did exist, it would be of no help to Golden Pacific. Even if in 1981 the Comptroller had made the kind of "commitment" asserted by Golden Pacific, he would not have been estopped from concluding in 1985 that he had made a mistake and from acting accordingly. *See Schweiker v. Hansen,* 450 U.S. 785, 789–90, 101 S.Ct. 1468, 1471–72, 67 L.Ed.2d 685 (1981) (government cannot be estopped from enforcing compliance with valid regulation merely because it has not enforced that regulation in the past). Consequently, even if the conduct on the part of the Comptroller alleged by Golden Pacific had taken place, it would not have changed the regulatory environment so as to compel a result different from the one reached in *California Housing Securities.*[16]

■ Golden Pacific's final argument—that the Comptroller closed a solvent Bank and therefore failed to advance a legitimate government interest—requires little discussion. Golden Pacific is arguing that the Comptroller "made a mistake" when he closed the Bank and that therefore compen-

---

**15.** For this reason, contrary to Golden Pacific's contention, there is no genuine issue of material fact on this point.

**16.** We do not understand Golden Pacific to be arguing that, because the Comptroller reneged on a commitment, his actions in declaring the Bank insolvent and placing it in receivership were not authorized. A taking claim depends upon the validity of the government's action. "This is because a 'Tucker Act suit does not lie for an executive taking not authorized by Con-

gress, expressly or by implication.'" *Tabb Lakes Ltd. v. United States,* 10 F.3d 796, 802 (Fed.Cir. 1993) (citations omitted). Neither do we understand Golden Pacific to be arguing the breach of contract claim which it abandoned before the Claims Court and which it therefore may not raise on appeal. *See Cedar Lumber, Inc. v. United States,* 857 F.2d 765, 767 (Fed.Cir.1988) ("arguments not presented to the trial court ... are deemed waived on appeal").

sation is due under the Fifth Amendment. This argument assumes, of course, that Golden Pacific had either the historically rooted expectation of compensation or reasonable investment-backed expectation necessary to support a taking claim, which it did not. That point aside, though, a mistake may give rise to a due process claim, but not a taking claim. *Tabb Lakes,* 10 F.3d at 803. And the due process clause of the Constitution is not a money-mandating provision. *See Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed. Cir.1989) (the due process clause "standing alone, cannot be ... interpreted to command the payment of money"). Such a money-mandating provision is required for a suit, such as this, under the Tucker Act. *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983). Golden Pacific's mistake argument must be rejected.

### CONCLUSION

In its ownership of the Bank, Golden Pacific did not have either the historically rooted expectation of compensation or the reasonable investment-backed expectation necessary to support a Fifth Amendment taking claim. Accordingly, the judgment of the Claims Court is affirmed.

Each side shall bear its own costs.

**AFFIRMED.**