**AMBASE CORPORATION and Carteret Bancorp, Inc. Plaintiffs,**

and

**Federal Deposit Insurance Corporation, Plaintiff–Intervenor,**

v.

**The UNITED STATES, Defendant.**

No. 93–531C.

United States Court of Federal Claims.

Aug. 25, 2003.

**34**

Charles J. Cooper, Michael W. Kirk, David H. Thompson, and Hamish P.M. Hume, of Washington, D.C., for plaintiffs. John C. Millian, of Washington, D.C., and Laurence H. Tribe and Brian K. Koukoutchos, of Cambridge, MA, of counsel.

James J. Igo and Bruce C. Taylor, Federal Deposit Insurance Corporation, Washington, D.C., for plaintiff-intervenor.

David A. Levitt, Attorney, Civil Division, Department of Justice, Washington D.C., with whom were Mark A. Melnick, Assistant Director, David M. Cohen, Director, and David W. Ogden, Acting Assistant Attorney General, for defendant.

## OPINION

SMITH, Senior Judge.

This dispute is one of more than 120 *Winstar*-related cases arising out of the savings and loan crisis in the 1980's. The history of the thrift crisis and the subsequent measures taken by the government to resolve it, have been extensively discussed in the original *Winstar* cases. *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*"Winstar IV"*), *aff'g*, 64 F.3d 1531 (Fed.Cir.1995) (en banc) (*"Winstar III"*); *see also Winstar Corp. v. United States*, 25 Cl.Ct. 541 (1992) (*"Winstar II"*) (finding government breached plaintiffs' contract and entering summary judgment on liability); *Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990) (*"Winstar I"*) (finding an implied-in-fact contract was created by government's promise that corporations could

treat supervisory goodwill as a capital asset and amortize it over thirty-five years).

This case is before the Court on the issues of liability for breach of contract, a Fifth Amendment takings claim, and an illegal exaction claim. Based on the parties' briefs and oral presentations, the Court finds that an express contract existed, and that the government breached that contract. The Court, however, is unpersuaded by Plaintiffs' takings and illegal exaction arguments, and therefore finds that the government's action did not constitute a Fifth Amendment taking of Plaintiff's property rights nor an unlawful exaction of funds. The question of damages for breach of contract will be addressed in subsequent proceedings.

## FACTUAL BACKGROUND

### A. The Plaintiffs

This suit is brought against the United States by Plaintiffs, Ambase Corporation and Carteret Bancorp, Inc (collectively "Ambase") and Plaintiff–Intervenor, the Federal Deposit Insurance Corporation ("FDIC"), successor to the rights of Carteret Savings Bank, F.A. ("Carteret"). Carteret was incorporated on September 15, 1939, as a state chartered savings and loan association as Carteret Building and Loan Association of Newark, New Jersey. Carteret converted to a federally chartered mutual association on May 5, 1982, and to a federally chartered stock association on September 7, 1983. Carteret was renamed Carteret Savings Bank, FA on January 15, 1986.

In 1982, Carteret acquired two Federal Savings & Loan Insurance Corporation ("FSLIC")-insured thrifts, Barton Savings & Loan Association of Newark, New Jersey ("Barton") and First Federal Savings and Loan Association of Delray Beach, Florida ("Delray"). In 1986, Carteret acquired two more FSLIC-insured thrifts, First Federal Savings and Loan Association of Montgomery County, Blacksburg, Virginia ("First Federal"), and Mountain Security Savings Bank of Wytheville, Virginia ("Mountain Security"), along with a third thrift insured by

the Maryland Deposit Insurance Fund.[1] In 1988, Ambase Corporation purchased 100 percent of the outstanding stock of Carteret Bancorp, Inc., the holding company of Carteret. Ambase operated Carteret until December 4, 1992, when Carteret was seized by the Office of Thrift Supervision for failure to satisfy capital requirements. The FDIC then became the successor to the rights of Carteret.

## B. The 1982 Transaction

In the spring of 1982, government regulators began approaching potential acquirers to take over two FSLIC-insured failing thrifts, Barton and Delray. Both thrifts had recorded significant operating losses that had eroded their capital, had been out of regulatory compliance for at least a year, and were at or near insolvency.[2]

In August of 1982, Carteret submitted a bid to FSLIC to acquire Barton. Based upon the terms requested by Carteret, the Barton transaction was designed to be an "assisted" transaction. More specifically, Carteret requested FSLIC assistance in the form of a cash capital contribution and indemnification from various losses. The first condition of bids submitted on August 31, 1982, and September 16, 1982, stated Carteret's desire to record the Barton acquisition using the purchase method of accounting and amortize the resulting goodwill over a period of forty (40) years using the straight line method. Also, in August of 1982, Carteret made an offer to acquire Delray. Unlike the Barton offer, Carteret did not request FSLIC assistance, but instead emphasized in a letter dated August 24, 1982, that Carteret's offer to acquire Delray was premised on the use of the purchase method of accounting and reporting the resultant goodwill for any and all regulatory purposes.[3] Over the ensuing negotiations, the documents suggest that Carteret and FSLIC began to regard the Barton and Delray acquisitions as part of the same transaction. For example, in Carteret's final bid for Barton, it expressly conditioned the acquisition of Barton upon the successful acquisition of Delray.

The terms of Carteret's offers were acknowledged in a memorandum dated September 30, 1982, from the Director of FSLIC to the FHLBB recommending the merger of Barton and Delray into Carteret. The memorandum stated that Carteret's accountants believed that the acquisitions of Barton and Delray could appropriately be treated as purchase transactions under generally accepted accounting principles ("GAAP"), and that proposed resolutions would require that the accountants' opinions be furnished to the FHLBB. Lastly, the FSLIC memorandum included the goodwill that would result from the acquisition of Barton and Delray in calculating Carteret's projected viability after the acquisitions.

1. The third thrift was Admiral–Builders Savings and Loan Association of Parkville, Maryland ("Admiral"). Carteret agreed to acquire Admiral in exchange for the Federal Home Loan Bank Board's ("FHLBB") promise to convert Admiral to a federally insured institution. However, this part of the transaction did not involve the reporting of goodwill, and therefore is not at issue in this dispute.

2. Barton Savings incurred net losses of $609,000, $2,785,000, $4,613,000, and $4,916,000 for the years 1979, 1980, 1981, and the eight months ended August 31, 1982, respectively. By August 31, 1982, these losses had decreased Barton's net worth to the point where the thrift had become insolvent. Delray experienced similar large operating losses during this time period, and the FHLBB considered the thrift to be in the need of immediate remedial action.

3. The letter states in pertinent part:

> Carteret Savings is relying on the FHLBB to approve the adjustment of assets of the Resulting Association in accordance with the purchase method of accounting pursuant to the method generally accepted in the savings and loan industry on August 9, 1982. Carteret Savings also expects the FHLBB to approve the amortization of any goodwill created by such adjustment for up to a 40–year period and .... Notwithstanding any change in generally accepted accounting principles or interpretation thereof, pursuant to its authority ... Carteret Savings requests the FHLBB to permit the Resulting Association to report for any and all regulatory purposes as well as any reports published to its customers, creditors, depositors, security holders or the public, its financial condition and operations in accordance with the results of the adjustments described in the preceding sentences.
> Pl. FDIC "Short Form" Mot. for Partial Summ. J. ("FDIC") Tab 1, pp. 1–2.

On September 30, 1982, the FHLBB approved the terms of Carteret's offer to acquire Barton and Delray in FHLBB Resolutions 82–662, 82–663, and 82–664. FHLBB Resolution 82–662 expressly provided that "the mergers shall be accounted for using the purchase method of accounting in accordance with generally accepted accounting principles" and that "certification by Carteret's independent accountants that Carteret has accounted for the mergers in accordance with GAAP shall be considered satisfactory evidence that said purchase method of accounting is in accordance with GAAP." FDIC Tab 8, p. 3. The Resolution also stated the mergers were "instituted for supervisory reasons and that approval of such mergers is necessary to prevent the probable failure of Delray and the probable failure of Barton." *Id.* As directed by Resolution 82–662, the FHLBB also sent Carteret a forbearance letter dated September 30, 1982, confirming that Carteret could use the purchase method of accounting and amortize the resulting goodwill in accordance with GAAP. The final sentence of the forbearance letter purported to reserve certain rights by the FHLBB. Upon request for clarification by Carteret, in a letter dated October 12, 1982, the FHLBB stated the sentence in question "does not assert or preserve a right to enforce against Carteret the regulatory requirements as to which the paragraphs number 1 through 10 waive compliance." FDIC Tab 14. Carteret subsequently applied the purchase method of accounting to the Barton and Delray acquisitions, which resulted in Carteret recording approximately $46 million and $168 million, respectively, in goodwill on its books. Thereafter, the $214 million in goodwill was counted toward regulatory capitol by both the FHLBB and Carteret.

As noted above, the Barton acquisition was negotiated as an assisted transaction. Thus, on September 29, 1982, the discussions culminated in the execution of an Assistance Agreement between Carteret and FSLIC. The Assistance Agreement provided Carteret with a cash payment of $10.7 million within 10 days of the merger's effective date, and indemnification from various potential losses associated with the acquisition. In addition, the Assistance Agreement incorporated, by an integration clause, FHLBB's Resolutions, forbearance letter, and any interpretation or understanding agreed to in writing by the parties.

## C. The 1986 Transaction

By the mid–1980's, the financial condition of First Federal and Mountain Security had deteriorated to the point of insolvency. In response, FSLIC began soliciting acquirers for the failed thrifts. Carteret submitted its first proposal to acquire First Federal and Mountain Security in January of 1986. Over the next several months, Carteret, FHLBB, and FSLIC negotiated the terms of Carteret's acquisition of the insolvent thrifts. In the process, Carteret submitted several revised proposals, with the final offer contained in a letter to FSLIC on May 16, 1986. This letter set forth various forbearances sought by Carteret, and contained a section entitled "Acknowledgment of Accounting Treatment." This section set forth that Carteret wished to use purchase method accounting to record any intangible assets resulting from the acquisition of First Federal and Mountain Security.

On June 6, 1986, the FHLBB approved Carteret's offer to acquire First Federal and Mountain Security in FHLBB Resolution No. 86–566. The Resolution contained a section entitled "Accounting" which requested a concurring opinion from Carteret's independent public accountants as to the accounting treatment sought by Carteret for this supervisory transaction. Two days prior, Carteret received a report from its independent accountants indicating that "the accounting for the acquisition by Carteret as purchase transactions is in conformity with generally accepted accounting principles." FDIC, Tab 36. Also, on June 6, 1986, Carteret and FSLIC entered into an Assistance Agreement in connection with the acquisition of Mountain Security and First Federal. The Assistance Agreement contained an integration clause incorporating the contemporaneous resolutions and actions taken by the FHLBB, including FHLBB Resolution No. 86–566. The FHLBB Resolution and the Assistance Agreement completed Carteret's acquisition of First Federal and Mountain

Security, and Carteret applied the purchase method of accounting to the transaction and recorded $21.7 million in goodwill on its books. Thereafter, this goodwill was counted toward regulatory capitol by both the FHLBB and Carteret.

## D. Purchase of Carteret by Ambase

Throughout the mid–1980's, Carteret was a healthy and profitable business. By 1988, Carteret had grown to almost $6 billion in assets from under $2 billion in 1981.[4] In addition, Carteret recorded positive net income in every year from 1983 through 1988, and increased its regulatory net worth from $71 million at the end of 1982, to $321 million by April of 1988. Pl. Ambase Mot. for Partial Summ. J. ("Ambase") App. pp. 48, 210. A significant component of Carteret's net worth was the $182 million of goodwill remaining to be amortized from the acquisitions of Barton, Delray, First Federal, and Mountain Security. *Id.* at 152. At this time, Carteret's minimum capital requirement was $169 million. *Id.* at 218. Without the ability to count the remaining goodwill toward its regulatory capital requirements, Carteret would have had a regulatory capital deficit of approximately $30 million, rather than a regulatory capital surplus of approximately $152 million. *Id.* at 152, 210, & 218.

In August of 1987, Ambase and Carteret entered into a purchase agreement whereby Ambase would acquire Carteret's holding company, Carteret Bancorp, Inc., for $22.50 per share. In the fall of 1987, Congress enacted the Competitive Equality Banking Act of 1987 to refinance the FSLIC insurance fund. Ambase believed the legislation would limit cross marketing activities between Carteret and Ambase and materially affect the value of Carteret to Ambase. The parties renegotiated the terms of the agreement and lowered the acquisition price of Carteret Bancorp stock from $22.50 per share to $19 per share, for a total transaction price of $266 million. *Id.* at 288.

In the summer of 1988, Ambase submitted the required application to the FHLBB to acquire Carteret. The approval of the acquisition was recommended to the FHLBB by the Office of Regulatory Activities on August 2, 1988. The memorandum supporting the recommendation indicated that as of June 30, 1988, Carteret had $331.4 million in regulatory capital. On August 8, 1988, Ambase and the FHLBB signed a Stipulation and Agreement that, in addition to the $266 million Ambase agreed to pay to acquire Carteret, required Ambase to infuse additional capital into Carteret in the event that Carteret's capital fell below required levels in the future. Specifically, the parties signed a Regulatory Capital Maintenance/Dividend Agreement ("RCMA") on November 28, 1988, that stated for as long as Ambase controlled Carteret, Ambase would be obligated to infuse up to $50 million in additional capital to maintain Carteret's regulatory capital at required levels. Also part of the Carteret acquisition, the FHLBB allowed Ambase to sell an existing subsidiary, Imperial Premium Finance ("IPF"), to Carteret for $65 million. As a condition of the government's approval, however, Ambase agreed that if Carteret subsequently sold IPF to Ambase or to another entity prior to August 9, 1991, at a lower price, then Ambase would (under certain conditions) be obligated to pay Carteret the difference between $65 million and the lower sale price.

## E. FIRREA and the Effect on Carteret and Ambase

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") that established new requirements concerning the regulatory capital of thrifts. Pub.L. No. 101–73, 103 Stat. 183 (1999). Specifically, FIRREA established three new minimum capital standards: "tangible" capital, "core" capital, and "risk-based" capital. 12 U.S.C. § 1464(t) (1994). FIRREA also abolished the FHLBB and FSLIC, and transferred their authority to the newly created Office of Thrift Supervision ("OTS"). *Id.* at § 1462a(e). Under FIRREA, "Congress expressly restricted

---

4. As measured by deposits, by September 1987, Carteret was ranked as the 19th largest savings and loan association in the United States with assets of approximately $5.9 billion. Def. Mot. for Partial Summ. J. ("Def.") App. p. 224.

the continued use of supervisory goodwill to satisfy regulatory capital requirements." *Winstar III,* 64 F.3d at 1538. Specifically, after FIRREA's implementation, goodwill "could not be included at all in satisfying [the new] minimum tangible capital" requirements and only a certain amount of goodwill was permitted to be counted towards the new minimum core capital requirements. *Id.* By December 31, 1994, the remaining goodwill included in core capital requirements was completely eliminated. *Id.*

Given the amount of supervisory goodwill on Carteret's books, Carteret was particularly concerned about FIRREA's provisions that phased out the amount of supervisory goodwill that could be used towards meeting capital requirements. In an OTS Report of Examination dated May 22, 1989, regulators concluded that Carteret was "not likely to meet the tangible, leverage ratio, and risk based minimum capital levels required by FIRREA." Ambase App. p. 348. The report recommended that Ambase should "be required to infuse capital in Carteret Savings to bring the institution into compliance with FIRREA." *Id.* at 357. By December 19, 1989, Carteret determined that $19.6 million in additional capital was necessary for Carteret to comply with FIRREA's regulatory capital requirements. Under the obligations set forth in the RCMA, Ambase then contributed $20 million to Carteret to bring the bank into capital compliance by the end of 1989.

In June of 1990, OTS prepared another examination report that did not include Carteret's remaining supervisory goodwill in calculating regulatory capital, and consequently Carteret did not meet FIRREA's risk-based capital requirement. In a letter dated August 29, 1990, OTS requested "under the November 28, 1988 Regulatory Capital Maintenance/Dividend Agreement, that Ambase infuse additional capital into Carteret of at least the remaining amount required under the Agreement." *Id.* at 446. The letter also advised Ambase that OTS believed that Carteret would have a capital deficiency greater than $30 million and would require an additional capital infusion. Over the next several months, OTS made numerous requests for

Ambase to comply with its remaining obligations under the RCMA. On December 28, 1990, Carteret reported to OTS that it would fail to meet the minimum requirements for tangible, core, and risk-based capital on December 31, 1990. However, the letter also indicated that Carteret anticipated an increase in tangible capital of $50–60 million, due in part to a $30 million contribution by Ambase in the first quarter of 1991. On February 12, 1991, OTS issued a Consent Cease and Desist Order that required Ambase to infuse $30 million of expected proceeds from the sale of a subsidiary, Home Insurance Company, into Carteret. Ambase complied with the order and infused $30 million into Carteret on February 13, 1991.

On February 14, 1991, the OTS issued a Temporary Cease and Desist Order in connection with a notice of action it was taking directly against certain officers and directors of Carteret and Ambase. The OTS had discovered in late 1990 that Ambase's board of directors had approved bonus payments and loan forgiveness programs to certain officers and directors from proceeds of the sale of the Home Insurance Company. The OTS viewed these payments as unsafe and unsound business practices, and instituted administrative proceedings against the individuals. In April of 1991, to settle the dispute with OTS, Ambase agreed to acquire IPF from Carteret by August 9, 1991, for the greater of $65 million or the appraised value of IPF, and to transfer $12.5 million as a deposit for the acquisition of IPF. Ambase further agreed that the deposit would be forfeited if the deal did not close by August 9, 1991. Even with a government approved time extension, Ambase was unable to secure adequate financing for the acquisition, and pursuant to the agreement, Carteret received $12.5 million in escrowed funds.

### F. Preliminary Injunction

In an effort to forestall OTS from issuing further capital directives, Carteret filed suit against OTS in the United States District Court for the District of New Jersey on February 14, 1991, seeking injunctive and declaratory relief. On April 25, 1991, the district court issued a preliminary injunction

preventing OTS from disregarding Carteret's contractually bargained for supervisory goodwill. *Carteret Savings Bank, F.A. v. Office of Thrift Supervision*, 762 F.Supp. 1159 (1991) ("*Carteret I*"). The district court reasoned that Carteret had a substantial likelihood of success on the merits of both its contractual and takings claims, and that OTS's regulation of the bank without recognizing its supervisory goodwill as regulatory capital would cause irreparable injury, possibly including seizure. *Id.* at 1181. The OTS subsequently appealed the district court's decision. On May 7, 1992, the United States Court of Appeals for the Third Circuit vacated the district court's order granting the preliminary injunction. *Carteret Savings Bank, F.A. v. Office of Thrift Supervision*, 963 F.2d 567, 585 (3d Cir.1992) ("*Carteret II*"). The Third Circuit held that Carteret did not have a reasonable probability of success on the merits for its claim that FIRREA did not supersede its contracts to treat supervisory goodwill as regulatory capital. *Id.* In addition, the Third Circuit concluded that the United States Claims Court had exclusive jurisdiction over Carteret's takings claim pursuant to the Tucker Act. *Id.* at 584.

### G. Events Leading to the Seizure of Carteret

Following the district court's injunction in April of 1991, Carteret's capital position was recalculated by OTS by including all unamortized supervisory goodwill in regulatory capital. The recalculation revealed that Carteret had capital in excess of each of the three FIRREA requirements throughout 1990, and into the first quarter of 1991. Also in April, Carteret signed a Supervisory Agreement with OTS which imposed operating restrictions on Carteret and increased the bank's reporting requirements. The following month, Ambase installed new management at Carteret, including a new Chief Executive Officer and Chairman, Richard Bianco. According to Ambase, the immediate task facing the new management was to recapitalize Carteret with an infusion of capital from an outside investor. However, by June of 1991, Carteret had not secured new capital, and despite the inclusion of supervisory goodwill in regulatory capital, reported to the OTS that it had failed to meet all three minimum capital requirements. In September of 1991, in response to a third Capital Directive from the OTS, Carteret submitted a Capital Plan that projected full compliance with FIRREA capital requirements by June 30, 1994. Unsatisfied with Carteret's progress and projections, on October 25, 1991, the OTS transmitted a Supervisory Memorandum recommending to the Director of the OTS to appoint a receiver for Carteret.

On February 27, 1992, Carteret signed an agreement with the OTS that placed the bank in the OTS Accelerated Resolution Program ("ARP"). The ARP provided that a receivership would not be imposed for at least 90 days if Carteret permitted OTS to market the institution and progress was being made in securing outside capital. The Third Circuit vacated the preliminary injunction in May of 1992. *Carteret II*, 963 F.2d at 585. In June, August, and October of 1992, various investors considered investing in Carteret, but subsequently withdrew their preliminary agreements to invest. Despite Carteret's difficulty in securing new capital, by the end of November of 1992, Carteret had returned to profitability, recording positive net income of $11 million. Nonetheless, Carteret was unable to maintain sufficient tangible, core, and risk-based capital and on December 4, 1992, the OTS placed Carteret into conservatorship with the Resolution Trust Corporation ("RTC").[5]

While these facts would indicate that Carteret suffered no damage from the alleged breach of contract, the court has reserved this issue for the damages phase of this proceeding. The facts demonstrate that even with counting the remaining supervisory goodwill, Carteret had a negative regula-

---

5. On November 30, 1992, Carteret was insolvent in all three FIRREA capital measures with negative $58.7 million in tangible capital, negative $12.2 million in core capital, and negative $13.3 million in risk-based capital. Ambase App. p. 733. Consequently, Carteret failed to meet its minimum regulatory capital requirements by $128.6 million (tangible), $151.9 million (core), and $228.2 million (risk-based). *Id.*

tory capital position as early as June of 1991. Nonetheless, as the affidavit of Robert Walsh alleges Carteret's "spiral of death" began when "Carteret was forced to forego various investment opportunities, downsize its operations more than would otherwise be necessary, and liquidate various assets" in order to maintain its regulatory capital position with supervisory goodwill excluded as mandated by FIRREA. Pls.' Mem. Regarding Intervenor Pl. FDIC's Short–Form Mot. for Partial Summ. J., Ex. A, ¶ 15 (Aff. of Robert C. Walsh, dated February 13, 1991). The Court, of course, at this point expresses no view on this subject.

### H. Instant Litigation

Ambase filed a complaint in this Court on August 25, 1993, approximately nine months after Carteret was placed into conservatorship. The FDIC filed its Complaint on March 28, 1997. Soon thereafter, on April 14, 1997, Ambase filed an Amended Complaint. Pursuant to the Court's September 18, 1996, Omnibus Case Management Order, the FDIC filed a "Short Form" Motion for Partial Summary Judgment on Liability on March 31, 1998. On May 20, 1998, the defendant filed a Cross–Motion for Summary Judgment Concerning the 1986 Acquisitions. Subsequently, Ambase filed with leave of the Court a Memorandum Regarding Intervenor Plaintiff FDIC's Short–Form Motion for Partial Summary Judgment on October 28, 1998. On September 13, 1999, Ambase moved for Partial Summary Judgment on its takings claims. The government filed a Cross–Motion for Summary Judgment on Plaintiffs' Takings Claim on December 6, 1999. Oral argument on these motions was held on October 2, 2000.

### DISCUSSION

### I. STANDARD OF REVIEW

The motions pending before the Court seek summary judgment on contract liability and takings claims. Rule of the United States Court of Federal Claims ("RCFC") 56(c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that moving party is entitled to judgment as a matter of law." A material fact is a fact that might affect the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When deciding a motion for summary judgment, the Court must examine the non-movant's evidence in the light most favorable to the non-movant, and draw all justifiable inferences in favor of the non-movant. *Id.* at 255, 106 S.Ct. 2505. In the case of cross-motions for summary judgment, as there are here, each motion is evaluated under the standard. *Cubic Defense Sys., Inc. v. United States*, 45 Fed.Cl. 450, 457 (1999).

A long established rule of judicial construction is that constitutional questions should only be reached if there is no common law or statutory rule that resolves the particular question. Constitutional values are so fundamental that they should only be addressed in cases as a last resort. They implicate the delicate fabric underlying our society, and should not be dealt with lightly. With respect to takings questions this means that if relief may be had for a contract breach by the government through an action in contract under the Tucker Act, an alternative remedy is unavailable through a takings action for that breach of contract. *See Castle v. United States*, 301 F.3d 1328, 1341–42 (Fed.Cir. 2002); *Granite Management Corp. v. United States*, 55 Fed.Cl. 164, 165–67 (2003). The takings clause is thus a residuary clause that addresses those legal harms done by the government that are not covered by the traditional remedial schemes of contract, tort, taxation, patent, or other areas of federal statute.

In ruling on a motion for summary judgment, the Court "must be guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Thus, to prevail on a breach of government contract claim, a party must demonstrate the existence of the basic elements of a contract: mutual intent to contract, including offer and acceptance based on a meeting of the minds; consideration; and an individual with actual authority to

bind the government. In *Winstar*-related cases, determining whether a contract was formed often involves deciphering the parties' intent through a careful examination of the underlying documents and economic situation surrounding the transaction. To establish the existence of a taking within the meaning of the Fifth Amendment, a plaintiff must demonstrate that the government damaged or destroyed valid property rights without common law justifications. In the absence of an actual physical occupation of the property, which is the present case, a taking may occur where the governmental action amounts to an "acquisition of resources to permit or facilitate uniquely public functions." *Penn. Central Transp. Co. v. City of New York*, 438 U.S. 104, 128, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The central question for our takings analysis becomes whether a "resource" or type of property was taken from the holding company of Carteret, Ambase.

## II. ISSUES TO BE DECIDED

The following issues are currently before the Court and ripe for adjudication:

1. Did Carteret and the FHLBB intend, negotiate, and enter into agreements permitting Carteret to count supervisory goodwill toward meeting its regulatory capital requirements? Specifically:

a) Did the written agreements between Carteret and the FHLBB concerning the acquisitions of Barton in 1982, and Mountain Security and First Federal in 1986, create a contract to allow Carteret to count the resulting supervisory goodwill toward its minimum capital requirements?

b) Did the documents and circumstances surrounding Carteret's acquisition of Delray in 1982, create a binding contractual promise to permit Carteret to count supervisory goodwill as a result of the purchase method of accounting toward its minimum capital requirements?

2. If contracts did arise between Carteret and the FHLBB concerning the Barton, Delray, Mountain Security, and First Federal transactions, were the contracts breached by FIRREA and its implementing regulations in 1989?

3. Did the government's enforcement of FIRREA against Carteret effect a taking from Ambase, thereby requiring payment of just compensation under the Fifth Amendment of the United States Constitution?

4. Did the government unlawfully require Ambase to make capital contributions to Carteret after the implementation of FIRREA?

## III. BREACH OF CONTRACT CLAIM

At the outset, the Court is mindful of the Supreme Court's direction in *Winstar*, that a court in *Winstar*-related litigation should apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." *Winstar IV*, 518 U.S. at 871, 116 S.Ct. 2432. Springing from that decision and subsequent *Winstar*-related cases, elements indicative of contractual agreements permitting the use of regulatory goodwill have developed. As outlined in *Standard Federal Bank v. United States*, 2002 WL 31947572, *4–5 (Fed.Cl.) the first element in determining whether a goodwill contract was created is a merger proposal from the acquiring thrift containing a specific request for the purchase method of accounting. The second element is a course of extensive negotiations between the parties on this subject. Third, the FHLBB must pass a resolution expressly approving the use of the purchase method of accounting for regulatory goodwill, and specify both the goodwill amount and the exact amortization period permitted. Fourth, the institution at the heart of the transaction should require some from of FSLIC resolution which is the consideration the government is seeking. Lastly, the transaction is not economically viable or rational absent the goodwill treatment at issue. For example, without the ability to count supervisory goodwill toward meeting regulatory capital requirements, the surviving thrift would be in violation of regulatory net worth requirements from the moment the transaction was consummated. *Winstar IV*, 518 U.S. at 862–67, 116 S.Ct. 2432. This does not mean the plaintiff would have been irrational or "insane" to enter the contract. Rather, it means that a rational economic actor would

seriously reconsider the transaction without such a provision.

Here, Carteret alleges that the FHLBB and Carteret intended, negotiated, and entered into, agreements permitting Carteret to count supervisory goodwill toward meeting its regulatory capital requirements. In support, Carteret insists that the transactions in 1982 and 1986 would not have been possible without the FHLBB's promises. The Court will divide the transactions into two groups to determine the first step in Carteret's breach of contract claim, whether a contract existed. The Court will first examine the 1982 acquisitions of Barton and Delray. Second, the Court will turn to the 1986 Mountain Security and First Federal acquisitions. Once the Court has determined if any goodwill contracts existed between Carteret and the FHLBB, the Court will turn to the question of whether the implementation of FIRREA breached those contracts.

### A. The 1982 Acquisitions of Barton and Delray

 As described previously, Carteret entered into an assisted transaction to acquire Barton in the spring and summer of 1982. As a result of the acquisition, Carteret booked $46 million of goodwill in computing its regulatory capital position. Carteret now claims that a goodwill contract was created between Carteret and the FHLBB based on the negotiations surrounding the acquisition, the FHLBB's Resolution and Forbearance Letter, and the Assistance Agreement. First, Carteret alleges that FSLIC shopped the failing thrift to potential acquirers to avoid substantial draws on the FSLIC insurance fund. Second, Carteret claims that during the negotiations for Barton, Carteret clearly stated that the purchase method of accounting would be used to record the supervisory goodwill resulting from the transaction, with a specific amortization period. Third, the FHLBB Resolution and the FHLBB Forbearance Letter expressly called for the use of the purchase method of accounting to record goodwill and the use of goodwill for regulatory capital purposes. Fourth, Carteret notes that the Assistance Agreement contained an integration clause

that incorporated the FHLBB's Resolution and Forbearance Letter. Lastly, Carteret claims that the FHLBB approved the transaction with the understanding that Barton was failing and realized that absent supervisory goodwill, the transaction would have an adverse financial impact on Carteret.

Concurrently, and in conjunction with the Barton transaction, Carteret acquired another failing thrift, Delray. As a result of that acquisition, Carteret booked $168 million of goodwill which thereafter was counted toward regulatory capital. Because the Delray transaction lacked an Assistance Agreement, Carteret offers three theories upon which the Court could find a goodwill contract was created between Carteret and the FHLBB: (1) an express contract was formed; (2) a unilateral contract was formed; or (3) an implied-in-fact contract was created. Upon review of applicable precedent, the Court can dispense with Carteret's second and third theories because the lack of an Assistance Agreement will not preclude the finding that an express contract was created. As the Federal Circuit reasoned in *Cal Fed II*, "[I]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed." *California Federal Bank, FSB v. United States*, 245 F.3d 1342, 1347 (Fed.Cir.2001) (citation omitted) (*Cal Fed II*). Here, Carteret alleges that taken together, its bid letters for Delray, FSLIC memorandums, and the FHLBB resolutions provide more than sufficient evidence of an intent to enter into a bargained-for exchange between the parties. Thus, in the absence of an Assistance Agreement, the Court will pay careful attention to the contemporaneous documents and circumstances surrounding the Delray transaction in analyzing whether an express goodwill contract was created. *See id.* at 1346.

In response, the government argues that Carteret and the FHLBB did not enter into a goodwill contract in the Barton and Delray

transactions because the documents Carteret relies upon are not identical to the situation in *Winstar* and raise genuine issues of material fact. The government argues that unlike *Winstar* there is no evidence to support the inference that Carteret and FSLIC negotiated for the use of purchase method accounting. For instance, the government claims that FSLIC never agreed to the utilization of purchase method accounting or to a forty (40) year amortization period, nor did FSLIC recommend the FHLBB to do so. The government contends the evidence suggests that Carteret was merely concerned about a proposed change in the Financial Accounting Standards Board ("FASB"), and once it was satisfied that the proposed change would not affect the Barton and Delray acquisitions, Carteret effectively dropped the issue. Also unlike *Winstar*, the defendant argues the evidence demonstrates that the FHLBB was not aware of, nor explicitly approved, any deal FSLIC negotiated with Carteret. In the present case, the government claims that neither the FHLBB Resolution nor the Forbearance Letter state that the Board is approving any particular period of amortization, and that the Forbearance Letter simply commits the FHLBB not to challenge Carteret's accountant's representation that purchase accounting is consistent with GAAP.

The Court is of the opinion that numerous factors support the conclusion that the FHLBB entered into goodwill contracts that permitted Carteret to use the purchase method of accounting for the Barton and Delray transactions for regulatory purposes. First, Carteret's merger proposals contained a specific request for the purchase method of accounting. For example, Carteret's bid letters for Barton dated August 31, 1982, and September 16, 1982, stated that Carteret would be "using the Purchase Method of Accounting for accounting purposes. The cost in excess of the fair market value of assets acquired (goodwill) is to be amortized to expense over a period of forty (40) years using the straight-line method." FDIC Tab. 2, p. 1. Also, in Carteret's bid letter for Delray dated August 24, 1982, Carteret emphasized that "[C]arteret Savings is relying on the FHLBB to approve the adjustment of assets of the Resulting Association in accor-

dance with the purchase method of accounting .... Carteret Savings also expects the FHLBB to approve amortization of any goodwill created by such adjustment for up to a 40–year period ...." FDIC Tab 1, p. 1. The Court agrees with Carteret that these requests were specifically made because "Carteret was not content to rely solely upon the FHLBB's published policy regarding the applicability of the purchase method of accounting to the acquisition of insolvent or troubled FSLIC-insured thrift instructions." Reply of the FDIC to the Sixty–Day Resp. and Cross–Mot. for Summ. J. and 120–Day Resp. of the United States, App., ¶ 12 (Aff. of Douglas P. Faucette, dated February 12, 1991).

Second, the evidence indicates that the Barton and Delray acquisitions were the product of thorough negotiations between Carteret and FSLIC. While the negotiations took place in a condensed period of time, the documents indicate that the parties understood that purchase method accounting for regulatory purposes for a specified amortization period was a "central consideration" and "an essential term" of the acquisitions. *See Cal Fed II*, 245 F.3d at 1348. As described above, the bid letters pertaining to Barton and Delray expressly made the use of purchase accounting a condition of Carteret's offer. Further, Carteret's bid letter dated September 16, 1982, stated that the Barton bid was "directly linked to Carteret's successful application by merger of Delray." FDIC, Tab 3, p. 2. The Delray bid letter dated August 24, 1982, captured one aspect of the negotiations when Carteret clarified its Delray bid in light of a proposed change in GAAP. For example, Carteret expressed to FSLIC that the bid was conditioned on FHLBB's agreement "to permit the Resulting Association to report for any and all regulatory purposes ... its financial condition and operations in accordance with" a forty (40) year amortization period of any goodwill resulting from its acquisition of Delray "notwithstanding any change in generally accepted accounting principles or interpretation thereof ...." FDIC Tab 1, p. 1. If the FHLBB was unwilling to agree to these terms, Carteret alternatively proposed "that

the FSLIC pay to the Resulting Association annually for a period of 10 years the difference between earnings of the Resulting Association without such adjustment and the earnings which would have resulted with such adjustments." *Id.* Therefore, Carteret offered the FHLBB a choice, between a cash payment or certain accounting treatment, and the FHLBB chose the latter.

Third, the FHLBB Resolutions, Forbearance Letter, and the FSLIC Assistance Agreement suggest that the FHLBB expressly approved the use of purchase method of accounting for regulatory goodwill in the Barton and Delray transactions. FHLBB Resolution No. 82–662, issued on September 30, 1982, states:

> RESOLVED FURTHER, That the mergers shall be accounted for using the purchase method of accounting in accordance with generally accepted accounting principles ("GAAP"); and

> RESOLVED FURTHER, That certification by Carteret's independent accountants that Carteret has accounted for the merger in accordance with GAAP shall be considered satisfactory evidence that said purchase method of accounting is in accord with GAAP . . . .

FDIC Tab 8, p. 3.

The same day, the FHLBB issued a Forbearance Letter to Carteret stating:

> Provided that Carteret submits to the Principal or other Supervisory Agent of the Bank Board, New York, New York, certification by Carteret's independent accountants that Carteret has accounted for the assets and liabilities acquired in the Mergers, and the resulting period for the amortization of goodwill and the accretion of the loan discount, in accordance with [GAAP], as GAAP existed at the time of the Bank Board's approval of the Mergers, such certification shall be considered to be satisfactory evidence that Carteret's use of the purchase method of accounting is in accordance with GAAP, and such use of the purchase method of accounting will be

considered to be in accordance with regulatory accounting procedures.

FDIC Tab 12, p. 3.

Lastly, on September 30, 1982, FSLIC and Carteret signed an Assistance Agreement whereby Carteret was to receive certain cash assistance in connection with the Barton transaction. Similar to the situation in *Glendale,* the Assistance Agreement contained an integration clause that expressly incorporated into the parties' written contract ". . . any resolutions or letters issued contemporaneously herewith by the [FHLBB] or the [FSLIC]. . . ." FDIC Tab 11, p. 36; *see Winstar IV,* 518 U.S. at 862, 116 S.Ct. 2432 (referring to a contract "that itself said nothing about supervisory goodwill, but did contain an integration clause" expressly incorporating "any resolutions or letters issued contemporaneously herewith."). These documents taken together provide sufficient evidence of the government's agreement to allow Carteret to use purchase method accounting for regulatory purposes.

The government urges the Court to view the documents as simply approving Carteret's merger application, and as an example of the FHLBB exercising its statutory responsibilities. While the government is correct that the documents do not refer to a specific amortization period, they do mention two important details. First, FHLBB Resolution No. 82–662 states that certification by Carteret's independent accountants will be satisfactory evidence of the use of purchase method of accounting for this transaction. *Winstar IV,* 518 U.S. at 862, 116 S.Ct. 2432 (resolution referred to a letter to be furnished by the thrift's independent accountant identifying and supporting the use of goodwill to be recorded). Carteret furnished the requested certification in a letter from its accountants dated September 29, 1982. FDIC Tab 4. Second, the FHLBB's Forbearance Letter went so far as to confirm, that Carteret could use the purchase method of accounting in accordance with "[GAAP], as GAAP existed at the time of the Bank Board's approval of the Mergers . . . ." FDIC Tab 12, p. 3. Therefore, on September 30, 1982, the FHLBB was certainly aware

that they were approving a transaction that would create supervisory goodwill to be amortized over a forty (40) year period using the purchase method of accounting, even if GAAP were to subsequently change. Lastly, as further evidence of their acceptance of purchase method of accounting, the FHLBB sent a letter to Carteret on October 12, 1982, clarifying an ambiguous statement in Paragraph 10 of the FHLBB's Forbearance Letter. FDIC Tab 14. The letter made clear that the FHLBB did not reserve any rights against Carteret with respect to the accounting commitments made in Paragraph 10, and intended no such reservation by the ambiguous statement. *Id.*

Fourth, the evidence demonstrates that Barton and Delray were insolvent, or on the brink of insolvency, at the time of the transaction. In FSLIC's recommendation memo to the FHLBB dated September 30, 1982, it reported that as of August 31, 1982, Barton had become insolvent, with a net worth of negative $930,309. FDIC Tab 7, p. 6. The memo also stated that Delray was "projected to become insolvent during September 1982." *Id.* at 8. Lastly, FHLBB Resolution No. 82–662, recognized the state of the impoverished thrifts as it stated:

> RESOLVED FURTHER, That the Bank Board finds that the mergers of Delray and of Barton with and into Carteret are instituted for supervisory reasons and that approval of such mergers is necessary to prevent the probable failure of Delray and the probable failure of Barton . . . .

FDIC Tab 8, p. 3.

It is clear that if the FHLBB had not approved the mergers of Barton and Delray into Carteret, then FSLIC would have been left supervising two insolvent thrifts with immediate financial needs. *See, e.g.,* FDIC Tab 7, p. 8 ("Alternative Solutions as to Barton").

Finally, a careful examination of the government's own documents reveals that it would not have been economically rational for Carteret to acquire Barton and Delray absent an agreement to permit the use of goodwill for regulatory purposes. As noted above, in September of 1982, Barton and Delray were thrifts in financial dire straits.

Prior to the merger, Carteret "operated relatively free of supervisory concern" and had operating ratios that were "generally more favorable than those of like-sized institutions." FDIC Tab 7, p. 11. In FSLIC's recommendation memo to the FHLBB, it projected that the "resulting association will report a profit during the second year after the merger and remain profitable thereafter. Net worth is projected to remain positive at all times." *Id.* at 13. This projection was based in part on FSLIC's "Viability" analysis of the resulting association. The analysis estimated goodwill in the amount of $269 million in calculating Carteret's total assets of $3.29 billion after the acquisition of Barton and Delray. *Id.* at 12. Total liabilities were projected at $3.25 billion. *Id.* The projected net worth of Carteret after the merger was $50.2 million, which included the $10.7 million FSLIC contribution. *Id.* Therefore, FSLIC represented to the FHLBB, that with the inclusion of $269 million in goodwill and FSLIC's cash contribution, the resulting association would have a positive net worth and a strong likelihood of success. However, if the $269 million in goodwill, or for that matter, the $214 million that actually resulted from the acquisitions, was backed out of the FSLIC projections, Carteret would have had a negative net worth of $220 million, or $165 million, as a result of acquiring the two failing thrifts. *See id.* Again, similar to the circumstances in *Glendale,* "the realities of the transaction favor reading those documents as contractual commitments," particularly given that the acquisition "would have rendered [the thrift] immediately insolvent . . . but for Glendale's [and Carteret's] right to count goodwill as regulatory capital." *Winstar IV,* 518 U.S. at 863, 116 S.Ct. 2432. Hence, "it would have been irrational in this case for [Carteret] to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment." *Id.*

In sum, this Court concurs with the New Jersey federal district court's conclusion in 1992, that the evidence of a contractual agreement regarding the inclusion of supervisory goodwill in the calculation of regulatory capital for the Barton and Delray acquisi-

tions was "overwhelming." *See Carteret I,* 762 F.Supp. at 1172 (D.N.J.1991), *rev'd on other grounds,* 963 F.2d 567 (3d Cir.1992).

### B. The 1986 Acquisition of Mountain Security and First Federal

In June of 1986, Carteret acquired two failing thrifts, Mountain Security and First Federal, in an assisted transaction. As a result of the acquisitions, Carteret booked $21.7 million of goodwill, $20 million from Mountain Security and $1.7 million from First Federal. Similar to the Barton transaction, Carteret alleges that the documents and circumstances surrounding the acquisitions of Mountain Security and First Federal reflect the government's contractual commitment to permit Carteret to count the resulting goodwill towards its regulatory capital requirements for a twenty-five (25) year period. Specifically, Carteret points to the bid letters, FHLBB Resolution No. 86–566, and the FSLIC Assistance Agreement to support the existence of a goodwill contract.

The government, however, argues that the record demonstrates that Carteret explicitly withdrew any request for an accounting forbearance related to purchase method accounting because Carteret was confident the accounting it proposed was consistent with GAAP. Additionally, the government suggests the parties' negotiations reveal that Carteret was extremely careful in addressing the terms and conditions it felt were necessary to consummate the transaction, and simply did not seek a contractual right to count supervisory goodwill as regulatory capital. Lastly, the government argues that the economic circumstances surrounding the transaction do not support the inference of a goodwill contract. For example, even without the inclusion of $21.7 million in resulting goodwill, Carteret fully satisfied all capital requirements following the merger.

The Court is of the opinion that the factors indicative of contract formation in the *Winstar* context support the conclusion that the FHLBB entered into a goodwill contract in the 1986 transaction permitting Carteret to use the purchase method of accounting for regulatory purposes. First, while Carteret's initial bid proposal did not contain a specific

request for the use of purchase method of accounting, the final bid proposal did contain a request for a "written acknowledgment" that the proposed accounting treatment would be regarded as acceptable. FDIC Tab 18, p. 4. The government makes much of the fact that Carteret's first, second, and third revised bids did not request that supervisory goodwill be included in the calculation of regulatory capital. However, beginning with a bid letter dated April 11, 1986, Carteret expressly requested specific accounting treatment over a twenty-five (25) year period for the 1986 transaction. FDIC Tab 16, p. 8. Furthermore, Carteret reiterated in its final bid proposal on May 16, 1986, that:

> The accounting to be used by Carteret in connection with the proposed acquisition will be in accordance with generally accepted accounting principals ("GAAP"), and Carteret will obtain an opinion from its independent certified public accountant to this effect. Therefore, no accounting forbearances are requested. Nonetheless, in order to ensure that there is no confusion with regard to the accounting treatment contemplated, Carteret requests that the FHLBB provide written acknowledgment that the following accounting treatment will be regarded as acceptable under the conditions indicated.

> For purposes of reporting to the FHLBB, with respect to the books and records of First Federal (or its successor), push-down accounting shall be used to record the purchase of the capital stock of First Federal (or its successor).

> For purposes of reporting to the FHLBB, the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchase, may be amortized by First Federal (or its successor) by the straight line method over a period not to exceed 25 years.

> For purposes of reporting to the FHLBB, Carteret Saving's board of directors shall, by appropriate resolution adopted within 30 days following the effective date of the merger with Mountain Security, elect to account for the merger, in accordance with the purchase method of accounting under GAAP, or alternatively,

to apply the purchase method, except that the value assigned to any intangible assets shall be amortized by the straight line method over a period no longer than 25 years.

Not later than 90 days following the Closing Date, Carteret shall submit to the Supervisory Agent an independent certified public accountant's opinion that Carteret has accounted for the transaction in accordance with GAAP and that the value of any intangible assets resulting from the transactions may be amortized by Carteret by the straight line method over a period not to exceed 25 years.

FDIC Tab 18, pp. 4–5.

The government argues that Carteret's statement, "[T]herefore, no accounting forbearances are requested", disclaimed any right it had to count goodwill in computing its regulatory capital. However, when the statements are read together, while Carteret may not have requested a specific accounting forbearance, it did request, in great detail, the type of accounting treatment they sought for this transaction. Therefore, the evidence clearly demonstrates that Carteret sought an acknowledgment from the government that it would be permitted to include supervisory goodwill in its regulatory capital.

Second, the series of revised offers from Carteret to FSLIC provide ample evidence of extensive negotiations between the parties. The negotiations between the parties began in early January of 1986. Carteret's initial offers contained numerous terms and conditions that were discussed and revised throughout the course of the negotiations. For example, Carteret initially requested branching rights for Virginia, Maryland, Delaware, Pennsylvania, New York and the District of Columbia. FDIC Tab 15, pp. 2–3. By February 6, 1986, in Carteret's second revised bid, it agreed to drop its request for branching rights in New York, Pennsylvania, and Delaware. Def.'s Reply to FDIC's Opp'n to Cross–Mot. for Summ. J. and to Pls.' Mem. Regarding Intervenor Pl. FDIC's Short–Form Mot. for Partial Summ. J. ("Def.'s Reply") Ex. 5, p. 2. Similarly, in Carteret's third revised bid, it agreed to increase its loss exposure and reduce its

subsidy demand. Def.'s Reply Ex. 7, pp. 1–2. Carteret's first request for an accounting forbearance appeared in a proposal dated April 11, 1986. FDIC Tab 16, pp. 12–13. Twelve days later, Carteret revised its request from an accounting forbearance to an acknowledgment of accounting treatment. FDIC Tab 17, p. 8. Carteret repeated this request in its final proposal dated May 16, 1986. FDIC Tab 18, pp. 4–5. Clearly, Carteret's request for a written acknowledgment of the proposed accounting treatment was a central term discussed during the merger negotiations. *See Winstar IV*, 518 U.S. at 849, 855, 116 S.Ct. 2432 (stating "[r]ecognition of [supervisory] goodwill under the purchase method was essential to supervisory merger transactions ..." and "the advantageous treatment of amortization schedules ... in supervisory mergers amounted to more clear-cut departures from GAAP and, hence, subjects worthy of agreement ....").

Third, FHLBB Resolution No. 86–566 accepted Carteret's proposed treatment of supervisory goodwill by requesting an independent public accountant's statement specifically describing the goodwill and related amortization periods resulting from the acquisition of Mountain Security and First Federal. The FHLBB approved the 1986 supervisory transaction on June 6, 1986. The government argues that consistent with Carteret's disclaimer of an accounting forbearance, the Resolution merely stated that "in accounting for the acquisition ... Carteret shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC." FDIC Tab 24, p. 17. Furthermore, the Resolution never mentioned the phrase "purchase method of accounting", nor did it specify the goodwill amount or exact amortization period. However, the Resolution does expressly approve and request that Carteret furnish to the government an independent public accountant's report confirming the proposed use of supervisory goodwill. Specifically, the Resolution states:

RESOLVED FURTHER, That no later than ninety (90) days following the latest of the effective date of the Acquisition of MSSB, the First Federal Merger and the New Admiral Merger [*not in dispute in this case*], Carteret shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants (which indicates that the Acquisition and Mergers were consummated in accordance with generally accepted accounting principles-except as otherwise authorized by the Bank Board), satisfactory to the Supervisory Agent and the Office of Examinations and Supervision, which shall (a) specifically describe as of the respective dates of the Acquisition of MSSB, the First Federal Merger, and the New Admiral Merger any intangible assets, including goodwill or the discount and premiums arising from the Acquisition of MSSB, the First Federal Merger, and the New Admiral Merger to be recorded on Carteret's books and (b) substantiate the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discount and premiums and the related amortization periods and methods.

FDIC Tab 24, p. 17.

The requested letter was sent to Carteret[6] on June 4, 1986, and in pertinent part stated:

Management of Carteret will record the acquisition as purchase transactions under generally accepted accounting principles and accordingly the assets and liabilities will be recorded at fair value. The cost in excess of fair value of net assets acquired will be recorded as goodwill and will be amortized over its estimated useful life of 25 years on a straight-line basis.

FDIC Tab 36.

Therefore, it appears to the Court that the "written acknowledgment" Carteret sought for the proposed accounting treatment of the

supervisory goodwill was received in FHLBB Resolution No. 86–566.

Fourth, the evidence demonstrates that Mountain Security and First Federal were insolvent at the time of the transaction. Mountain Security's financial difficulties began in September of 1983, with the acquisition of an Arizona-based mortgage company. Mountain Security was unaware of the extent of the acquired's loan commitments and was forced to use brokered deposits to fund the excessive commitments. By April 30, 1986, the thrift was insolvent with assets of $119.7 million and negative net worth of approximately $5.7 million. FDIC Tab 19, p. 1. Primarily due to the economic climate of high interest rates, First Federal had reported a net loss for every semiannual period since December 31, 1981. As a result of the continued losses, First Federal exhausted its net worth in the third quarter of 1984. As of April 30, 1986, the thrift was insolvent with assets of $15.4 million and negative net worth of $1.1 million. *Id.* Thus, it is clear to the Court that FSLIC eagerly shopped the failing thrifts to prospective bidders, and by approving the merger with Carteret, the FHLBB saved FSLIC approximately $14.5 million in liquidation costs. FDIC Tab 19, p. 6.

Fifth, unlike the situation in the 1982 acquisitions, there appear to have been alternative business reasons for Carteret to enter into the Mountain Security and First Federal transactions. The government argues that the economic circumstances do not support the inference of a goodwill contract because the $21.7 million in goodwill generated by the transaction was relatively small in comparison to Carteret's net worth of approximately $277.9 million. FDIC Tab 19, p. 1. The government suggests that Carteret's strong capital position dwarfed any concerns over retaining additional supervisory goodwill, and its main objective was to acquire branching rights in Maryland and the District of Co-

---

6. The record does not contain evidence of transmittal of the accountant's letter to the FHLBB. Nonetheless, the extrinsic circumstances, as in *Cal Fed*, make it highly unlikely that the letter was not sent and received by the FHLBB. Both parties contemporaneous actions confirm this. Further, as this Court stated in *Cal Fed*, the accountant's opinion provision "imposed an independent duty on [the thrift] to supply such an opinion—not that the opinion was a condition of the Government's own contractual obligation to permit purchase accounting." *California Federal Bank, FSB v. United States*, 39 Fed.Cl. 753, 770 (1997).

lumbia. Carteret does not dispute that acquiring branching rights was part of its motivation, but counters that the government's contention closely resembles the "absence of madness" argument presented as "Common Issue 6" in *Cal Fed*, 39 Fed.Cl. 753, 767–68 (1997). Furthermore, Carteret states that its strong capital position was due in large part to the $214 million in supervisory goodwill springing from the 1982 acquisition. As the Court reasoned in *Cal Fed*, we reject the government's inference and reiterate, "[t]he fact that [the acquiring thrift] might have been healthy enough to weather a government breach of its contract obligations . . . is not relevant to whether a contract existed." *Id.* at 768. By taking on the assets and liabilities of the failing thrifts, Carteret saved the FSLIC insurance fund an estimated $14.5 million. FDIC Tab 19, p. 6. As the Court stated in *Cal Fed*, the government's "argument ignores the Supreme Court's finding that the primary motivation to consummate the relevant transactions came from the Bank Board's 'plan to avoid the insurance liability'." 39 Fed.Cl at 764 n. 10 (citing *Winstar IV*, 518 U.S. at 847, 116 S.Ct. 2432). Therefore, even though Carteret would not have been in violation of regulatory capital requirements following the merger, Carteret's request to account for the resulting goodwill in a particular fashion was one of several important motivations surrounding the transactions. Without the goodwill, it is likely Carteret would not have entered the transaction.

In sum, the Court believes that the factors outlined in *Standard Federal* sufficiently demonstrate that a contractual obligation was created between Carteret and the FHLBB to permit the use of purchase method accounting to amortize supervisory goodwill over a twenty-five (25) year amortization period.

### C. Breach of Contract by FIRREA

▮ The contracts described above permitted Carteret to report approximately $200 million in supervisory goodwill immediately prior to FIRREA's passage and the implementation of the OTS regulations. As described previously, FIRREA precluded Car-

teret from using the regulatory goodwill to meet its "tangible" capital requirements, and further restricted it from using the goodwill to meet its "core" and "risk-based" capital requirements. Thus, the Court is convinced that the OTS restrictions were in clear violation of the contracts created in the 1982 Barton and Delray Transaction and the 1986 Mountain Security and First Federal Transaction. *See Winstar III*, 64 F.3d at 1544–45 ("There can be little question that the application of FIRREA and the regulations thereunder was a breach of FSLIC's and the Bank Board's agreements with them."). Accordingly, the Court GRANTS Plaintiff–Intervenor's Motion for Partial Summary Judgment on the 1982 and 1986 Transactions, and DENIES Defendant's Cross–Motion on the 1986 Transaction.

### IV. TAKINGS CLAIM

In *Armstrong v. United States*, the Supreme Court stated that the Fifth Amendment's guarantee "that private property will not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). In this case, Ambase contends that it has been forced to bear a public burden because of the government's enactment of FIRREA that led to the seizure of Carteret. Specifically, Ambase argues that the Takings Clause entitles it to compensation in an amount equal to the fair market value of Carteret because the government chose to violate Ambase's reasonable investment-backed expectations by breaching its contract with Carteret and refusing to pay any damages for that breach. Further, the defendant's refusal allegedly caused Carteret to fall out of regulatory compliance and to be seized by government regulators. In effect, Ambase argues that an unacknowledged breach of contract by the government is a taking when it causes collateral or consequential damage.

The government responds that the Federal Circuit's decisions in *Branch v. United States*, 69 F.3d 1571 (Fed.Cir.1995) and *Cas-*

**50**

*tle v. United States,* 301 F.3d 1328 (Fed.Cir. 2002), and this Court's decision in *Bailey v. United States,* 53 Fed.Cl. 251 (2002), hold that the imposition of a conservatorship on a failed thrift is not, and cannot, be a taking. The government also maintains that Ambase lacks a direct takings claim because in the event the imposition of FIRREA on Carteret's goodwill contracts were deemed a taking, it would be a taking of the thrift's property and not the stockholder's property. In response to Ambase's reasonable investment-backed expectations claim, the government asserts that there is no taking because it is unreasonable for expectations of stockholders to be violated when the government imposes a conservatorship on a thrift for reasons of safety and soundness. Thus, the government contends that Ambase lacks a direct claim for a taking of Carteret other than as a beneficiary of a potential receivership surplus if one is held to exist.[7]

■ The first step in analyzing whether a taking has occurred is for a court to determine what property interest was taken. *Branch,* 69 F.3d at 1575; *Bailey,* 53 Fed.Cl. at 257; *Hage v. United States,* 35 Fed.Cl. 147, 168 (1996). As discussed previously, Ambase was not a party to the supervisory goodwill contracts that were subsequently breached by the government through the enactment of FIRREA. Ambase is therefore not seeking just compensation for the taking of Carteret's contract remedy, but instead is claiming just compensation for the taking of its bank. However, it is well established that the government's seizure and closure of an insolvent bank and the appointment of a receiver to control the bank's assets pursuant to valid federal statutes is not a taking under the Fifth Amendment. *See Golden Pacific Bancorp v. United States,* 15 F.3d 1066, 1073–74 (Fed.Cir.), *cert. denied,* 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *California Housing Secs., Inc. v. United States,* 959 F.2d 955, 957–60 (Fed.Cir.), *cert. denied,* 506 U.S. 916, 113 S.Ct. 324, 121 L.Ed.2d 244

(1992). Realizing the adverse precedent, Ambase argues that as the sole shareholder of Carteret, it had a reasonable investment-backed expectation that the government would honor the goodwill contracts with Carteret, and that the enforcement of FIRREA confiscated that expectation and Ambase's ability to operate Carteret. Thus, Ambase urges the Court to view the property interest at issue as Ambase's reasonable investment-backed expectation that Carteret's supervisory goodwill would be treated as regulatory capital by the government.

■ Ambase's argument is correct in that a misconception has been created by the phrase "that there were no investment backed expectations in the property because the subject matter was a heavily regulated industry." *See, e.g., Branch,* 69 F.3d at 1582 ("it would have been unreasonable for the owners of the Maine National Bank to expect that the bank's assets would never be subject to liability based on losses suffered by other members of the BNEC system."); *Golden Pacific Bancorp,* 15 F.3d at 1074–75 ("Golden Pacific did not possess either the historically rooted expectation of compensation or the reasonable investment-backed expectation necessary to support a Fifth Amendment taking because it chose to invest in an entity-the Bank-which did not possess the right to exclude others. And the reason the Bank did not possess the right to exclude others . . . was that the Bank was a member of a highly regulated industry."); *American Continental Corp. v. United States,* 22 Cl.Ct. 692, 697 (1991) ("when an investment is made in such a highly regulated industry, to be reasonable, expectations must be based not only on then-existing federal regulations but also on the recognition that there may well be related changes in the regulations in the future"). This has often been misconstrued in briefs to the effect that no taking claim may be brought in an area such as banking because the investors should expect "any" regulatory exaction. This is not correct.

7. The government also requests that the Court disregard Ambase's argument that in determining the compensation to which Ambase might be entitled if it proves a taking, the Court should look past the holding of *Bailey* and not offset the thrift's alleged expectancy damages in the ab-

sence of FIRREA by the receivership deficit. *See* 53 Fed.Cl. at 257 (holding that shareholders property interest in a takings claim could not be their interest in thrift as a corporate entity). As the discussion *infra* indicates this issue is moot.

The manner in which the concept should be understood is that investment-backed expectations always depend on the underlying restrictions at the time of purchase. For example, in buying land zoned single family-residential, a property owner has no legitimate investment-backed expectation that he can dig a coal mine. However, the owner does have an investment-backed expectation that he can build a single family home. Likewise, even in an area regulated as heavily as banking, numerous possible government actions would invoke the Fifth Amendment. For example, confiscating a healthy and legally compliant bank to serve as a government bank. Also, confiscating a bank's stock from the bank's owner so that the stock could be given to a failing bank as capital could constitute a taking under the Fifth Amendment. While we could come up with numerous other examples it should be clear that what investment-backed expectations exist are determined by the facts of each regulatory regime and what is foreseeable within that regime. While Ambase presents a novel and creative argument, it nonetheless encounters a difficulty. An investment-backed expectation is not property. Rather it is a test for determining whether a right to something is property. For example, the fact that you have bought a piece of land to build a home on is *prima facie* evidence that you have a valid property right in that land to build a home. This, of course, may be refuted by a preexisting zoning restriction, for example. Thus, a doctrinal test is not property, not even of the justices who created it.

Simply put, Ambase's takings claim is that the government took its bank, for which it paid $266 million, by not honoring the goodwill contracts created in the 1982 and 1986 transactions. While takings theory has become complicated by the distinction between physical takings and regulatory takings, and within regulatory takings among those that are *per se,* those that are partial, see *Florida Rock Industries, Inc. v. United States,* 45 Fed.Cl. 21, 37 (1999), and those that require the *Penn Central* analysis even though they may be close to total, see *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124–28, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), we need not reach these issues here. Instead, this case presents us with a question of causation.

In many areas of law the courts have dealt with the question of what constitutes legally sufficient causation. Or put another way, how do we determine what actions related to a harm justify the assessment of damages against the actor? This problem is complicated by the reality that everything in the world has some impact on the course of events. The fact that my alarm clock was defective and caused me to be twenty minutes late and thus put me in the path of a drunk driver and therefore sustaining serious injuries does not allow me to sue the alarm clock company. In order to reach this result courts and scholars use the language of foreseeability. This concept limits the relation between action and legal harm to those effects within the common and expected consequences of the action in the discipline at issue. This balance is always changing as science and technology increase our understanding of the world's interconnections. It is also group specific as the standard for a doctor giving medical treatment is different than the standard for a lay person giving emergency medical treatment.

In light of these general concepts, the issue in this case is whether an action by the government against the corporation, that destroys the corporation's value, can be the legal cause of the shareholder's loss in value. The answer seems to the Court to depend on what the character of the government action was. If the government's action is legally compensable under some remedial system then the answer appears to be that there is no legal cause that would justify a takings claim. In this case that is clearly the situation. The government's breach of contract creates in the corporation, here Carteret, a cause of action against the government. If Carteret prevailed in the breach of contract action, the corporation would be restored to the position it would have been in and the shareholder would have lost nothing by the government's action. Therefore, the takings claim can only exist if there is no remedy other than a takings claim for the government's breach of contract. *Cf. Castle,* 301

F.3d at 1341–42 (holding plaintiffs retained full range of contract remedies associated with any contractual property right they possessed). But clearly there is a contract remedy. *See Winstar IV,* 518 U.S. at 870–71, 116 S.Ct. 2432.

There is a bitter truth in this logic, however. Very few if any legal judgments put the party injured in the same position as if the injury had never occurred. A man who has lost his leg in an auto accident will never be the same no matter how much money he receives in compensation. An opportunity lost can never be regained years later. A money judgment years later is always speculative when compared to day to day certainty. And yet that is all that legal redress is about. In this case, however, there is a particular fact that makes compensation appear particularly inadequate. That inadequacy is the apparent rule of law that bars an interest award on the much delayed compensation to Carteret. This may be unjust, but the fault lies not in legal theory, but in the limitations sovereign immunity imposes on the courts. *See Suess v. United States,* 52 Fed.Cl. 221, 232 (2002) (describing the court's inability to make damaged parties whole due to the prohibition on the award of prejudgment interest).

Thus, the Court hereby DENIES Plaintiffs' Motion for Partial Summary Judgment with respect to its taking's claim, and GRANTS Defendant's Cross–Motion for Summary Judgment on Plaintiffs' Taking Claim.

## V. ILLEGAL EXACTION CLAIMS

In addition to its takings claim, Ambase alleges that the government must make restitution for the $62.5 million it unlawfully exacted from Ambase after breaching the goodwill contracts. Specifically, Ambase contends that the government's directives for it to make $50 million in payments under the RCMA were unlawful or *ultra vires* actions. Ambase argues its obligation under the RCMA was relieved once the government breached its contractual promise to Carteret to count supervisory goodwill as regulatory capital. Therefore, the government "illegally exacted" $50 million from Ambase under the

guise of the RCMA. Ambase also contends that the government had no right to demand that Ambase acquire IPF from Carteret, as the terms of the original "keep well" agreement were never triggered. Ambase suggests that the $12.5 million "deposit" was the result of extreme and unprecedented regulatory pressure by OTS, and that Ambase had little choice but to transfer the funds to Carteret.

The government responds that Ambase's payments to Carteret do not represent an illegal exaction on several accounts. First, under the RCMA, the government had the authority to require payments from Ambase when Carteret lacked the ability to maintain compliance with the minimum capital requirements. As discussed previously, Carteret failed to meet regulatory capital requirements at the end of 1989, and again in August of 1990, and the government argues that under the RCMA, Ambase was obligated to infuse Carteret with additional capital. Second, the government suggests Ambase's allegations do not support an illegal exaction claim because the payments were made to Carteret, not the government. Lastly, the $12.5 million payment was a part of an agreement that Ambase voluntarily entered into in order to settle a lawful OTS enforcement action.

■ This Court has jurisdiction under the Tucker Act to entertain claims of illegal exaction by the federal government. *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1008 (1967) (holding that "suit can be brought in this court to recover (such) exactions said to have been illegally imposed by federal officials . . . ."); *see Casa De Cambio Comdiv v. United States,* 291 F.3d 1356, 1363 (Fed.Cir.2002). An illegal exaction claim is one "in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum . . . . [t]he claim must assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport,* 372 F.2d at 1007. The Federal Circuit determined in *Aerolineas Argentinas v. United States* that payments made to an entity other than the

government can still fall within an illegal exaction claim. 77 F.3d 1564, 1573 (Fed.Cir. 1996) (finding "[t]he amount exacted and paid may be recovered whether the money was paid directly to the government, or was paid to others at the direction of the government to meet a governmental obligation."). To sufficiently allege an illegal exaction claim it is perhaps enough for the plaintiff to allege that the government's action is *ultra vires*, or "without legal justification." *See Clapp v. United States*, 127 Ct.Cl. 505, 117 F.Supp. 576, 581 (1954). *But see Don Roger Norman, et al. v. United States*, 56 Fed.Cl. 255, 267 (2003) (finding lack of subject matter jurisdiction because "any exaction of plaintiffs property .... did not stem from a direct result of the application of a statute.") (internal quotations omitted). Here, Ambase did not allege a specific statutory violation, but the Court assumes for purposes of analysis that the government's directives were based "upon a power supposedly conferred by statute," or "founded upon any Act of Congress." *Clapp*, 117 F.Supp. at 580.

 In the present case, Ambase contends that FIRREA's breach of Carteret's supervisory goodwill contracts excused it from performance under the RCMA. As such, the government had no authority to require Ambase to make $50 million in payments to Carteret. While the Court is sympathetic to the situation imposed upon Ambase and Carteret post-FIRREA, the uncontroverted evidence does not support an illegal exaction claim. In the RCMA, signed by Ambase on November 28, 1988, Ambase agreed that a condition of its purchase of Carteret included:

> As long as HGI controls the Institution, the Holding Companies, jointly and severally, will cause the regulatory capital of the Institution to be maintained at a level at or above the Regulatory Capital Requirement, and as necessary, will infuse or will cause to be infused sufficient additional capital, in a form satisfactory to the Supervisory Agent, to effect compliance with the

above stated requirement during the first quarter after which the Institution fails to meet the Regulatory Capital requirement; provided that the aggregate amount of the Holding Companies' obligation shall not exceed $50 million.

Ambase App. p. 279.

"Regulatory Capital Requirement" is defined in the RCMA as "the Institution's regulatory capital requirement at a given time established in accordance with 12 C.F.R. Section 563.13, or any successor regulation thereto." *Id.* at 278. At no place in the RCMA was OTS required to count supervisory goodwill as regulatory capital. Thus, there is no material breach of the RCMA upon the enactment of FIRREA. Ambase was required, in accordance with RCMA and FHLBB Resolution No. 88–657, "to maintain the Institution's regulatory capital at regulatorily required levels until such time as HGI is no longer in control of the Institution." *Id.* at 277. Clearly, the $20 million and $30 million payments were not part of an elaborate government shakedown, but were simply satisfaction of an earlier commitment made by Ambase to support Carteret in the event its regulatory capital fell below a sufficient level. Ambase's claim that these funds were illegally exacted fails as a matter of law.[8]

 Ambase also alleges that the government illegally exacted $12.5 million from Ambase when it unduly pressured Ambase to sign an alternative agreement to acquire IPF. Similar to the claim described above, Ambase suggests the government's actions were *ultra vires* or represented a regulatory taking. It is undisputed that when Ambase purchased Carteret in 1988, Ambase agreed that if Carteret sold IPF for less than $65 million prior to August 9, 1991, Ambase would pay Carteret the difference between the purchase price and $65 million. It is also undisputed that the conditions of this "keep well" agreement were never triggered. The government asserts, and Carteret can not deny, that a new agreement was entered into

8. In Ambase's Reply Brief, it suggests an alternative ground on which to recover the $62.5 million paid into Carteret. This argument, that the funds were taken from Ambase through government conduct that contravened Ambase's reason-

able, investment-backed expectations and must be repaid as part of just compensation under the Takings Clause, fails for the same reasons as discussed in Part IV.

on April 25, 1991, that required Ambase to "purchase for cash the capital stock of IPF from Carteret prior to August 9, 1991 for the greater of $65 million or the appraised value of IPF ... subject only to the arrangement of the required financing for such purchase." Def.App. p. 1021–22. The agreement also stated that "[i]t is expressly understood that if Ambase is unable to borrow an amount which, in its sole discretion is sufficient to finance the purchase of IPF by August 9, 1991, it has the right to terminate the purchase agreement without further obligation to purchase IPF." *Id.* at 1022. Lastly, the agreement required Ambase to deposit $12.5 million with Carteret in an escrow account to be applied to the purchase price, or "in the event said transaction is not closed by August 9, 1991, as its contribution to the capital of Carteret." *Id.* Thus, Ambase was on notice that the $12.5 million would be infused into Carteret after August 9, 1991, if they were unable to secure financing or chose not to purchase IPF. Despite Ambase's claims, the Court finds no evidence to contradict the voluntary character of the April 25, 1991 agreement, nor that the agreement had any related purpose beyond settling litigation with the OTS.[9] The uncontroverted evidence reveals that Ambase has failed to state a claim that the $12.5 million payment was "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport,* 372 F.2d at 1007.

Thus, the Court hereby DENIES Plaintiffs' Motion for Partial Summary Judgment on its claim that the government illegally exacted the $62.5 million Ambase infused into Carteret.

## CONCLUSION

Accordingly, the Court hereby GRANTS Plaintiff–Intervenor's "Short Form" Motion for Partial Summary Judgment on Liability and DENIES Defendant's Cross–Motion; DENIES Plaintiffs' Motion for Partial Summary Judgment; and GRANTS Defendant's

Cross–Motion for Summary Judgment on Plaintiffs' Taking Claim.

The Court also hereby SCHEDULES a telephonic status conference for Wednesday, October 1, 2003, at 3:30 p.m. EDT, to discuss the next steps in this litigation.

**It is so ORDERED.**

---

9. The record reveals that Ambase was given several additional months to secure the necessary financing to complete the purchase of IPF. *See* Def.App. pp. 1029, 1275. However, by early 1992, Ambase was unable to secure sufficient financing, and the $12.5 million became a capital contribution to Carteret.